IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

DEBBIE ANN PETRI, AS            §
ADMINISTRATOR OF THE ESTATE OF  §
PAUL TORRES, DECEASED, AND AS   §
GUARDIAN AND NEXT FRIEND OF     §
PATRICK DAMIAN TORRES, A MINOR  §
CHILD AND SOLE HEIR OF THE      §
ESTATE OF PAUL TORRES, DECEASED,§
                                §
              Plaintiffs,        §
                                §
TRINIDAD O. TORRES AND JESUSITA §
M. TORRES,                       §
                                §
              Intervenors,       §
VS.                             §   CIVIL ACTION H-09-3994
                                §   Consolidated with H-10-CV-122
                                §        and H-10-CV-497
KESTREL OIL & GAS PROPERTIES,   §
L.P., et al.,                    §
                                §
              Defendants.        §

OPINION AND ORDERS OF SUMMARY JUDGMENT

Pending before the Court in the above referenced wrongful
death and survivor action brought by Debbie Ann Petri as
Administrator Paul Torres' estate and as Guardian and Next Friend
of his minor heir, Patrick Damian Torres, removed from state court
on federal jurisdiction under the Outer Continental Shelf Lands
Act, are the following motions: (1) Defendant Peregrine Oil & Gas
II, L.L.C's motion for summary judgment (#125)[1]; (2) Defendants
Malcolm Good and Rotorcraft Leasing Company's motion for summary
judgment (#134) and motion to consider their unopposed motion for

---

[1] Because Intervenors Trinidad O. Torres and Jususita M.
Torres were terminated on January 13, 2011, their motion to join in
Plaintiffs' response to #125 (#149) is MOOT.

summary judgment (#292); (3) Defendants Shell Offshore Inc. and Shell Oil Company's motion for summary judgment (#145) and motion to consider their unopposed motion for summary judgment (#296); (4) Defendant Wood Group Production Services, Inc.'s motion for partial summary judgment (#146), motion to dismiss under Federal Rules of Civil Procedure 12(b)(6) and 12(e)(#156), and motion to bifurcate trial of separate issues (#208); (5) Peregrine Oil & Gas II, L.L.C.'s motion in limine (#218); and (6) Wood Group Production Services, Inc.'s motion in limine (#220).

The governing pleading is Plaintiffs' Second Amended Original Complaint (#130).  It alleges that Plaintiff Decedent Paul Torres ("Torres") was working in the course and scope of his employment for Wood Group Production Services, Inc. on an unseaworthy oil rig owned and/or operated by Defendant Peregrine Oil and Gas II, LLC when he was swept off the rig by heavy seas and killed.[2]  The complaint asserts gross negligence and/or malice against Defendant Wood Group Production Services, Inc., negligence against Shell Oil Company and Shell Offshore, Inc., and negligence and gross negligence against the other Defendants, acting in concert and individually, jointly and severally.  The Court will address the specific claims against each as it reviews the relevant motions.

<div align="center">

**Standard of Review**

</div>

---

[2] There is no dispute that the incident occurred on January 19, 2008.

Summary judgment is proper when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).[3]  The movant has the burden to demonstrate that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The substantive law governing the claims identifies the essential elements and thus indicates which facts are material. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Where the non-movant bears the burden of proof at trial, the movant need only point to the absence of evidence to support an essential element of the non-movant's case; the movant does not have to support its motion with evidence negating the non-movant's case. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).

If the movant succeeds, the non-movant must come forward with evidence such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 248.  The non-movant "must come forward with 'specific facts

---

[3] This Court would point out that in reviewing the evidence provided for the summary judgment issues, the Court does not refer to or rely on evidence that has been determined to be inadmissible by United States Magistrate Frances Stacy in this case.

showing there is a genuine issue for trial.'" *Matsushita Elec. Co.*
*v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).   "A factual
dispute is deemed 'genuine' if a reasonable juror could return a
verdict for the nonmovant, and a fact is considered 'material' if
it might affect the outcome of the litigation under the governing
substantive law." *Cross v. Cummins Engine Co.*, 993 F.2d 112, 114
(5th Cir. 1993).   Summary judgment is proper if the non-movant
"fails to make a showing sufficient to establish the existence of
an element essential to that party's case." *Celotex Corp.*, 477
U.S. at 322-23; *Piazza's Seafood World, LLC v. Odom*, 448 F.3d 744,
752 (5th Cir. 2006).   Although the court draws all reasonable
inferences in favor of the non-movant, the non-movant "cannot
defeat summary judgment with conclusory, unsubstantiated
assertions, or 'only a scintilla of evidence.'" *Turner v. Baylor
Richardson Med. Center*, 476 F.3d 337, 343 (5th Cir. 2007).
Conjecture, conclusory allegations, unsubstantiated assertions and
speculation are not adequate to satisfy the nonmovant's burden.
*Little v. Liquid Air Corp.*, 37 F.3d 1069, 1079 (5th Cir. 1994);
*Ramsey v. Henderson*, 286 F.3d 264, 269 (5th Cir. 2002).   Pleadings
are not competent summary judgment evidence.   *Little,* 37 F.3d at
1075; *Wallace v. Texas Tech. U.*, 80 F.3d 1042, 1045 (5th Cir. 1996).

A district court may not make credibility determinations or
weigh evidence when deciding a summary judgment motion.   *Chevron
Phillips*, 570 F.3d 606, 612 n.3 (5th Cir. 2009), *citing EEOC v. R.J.*

*Gallagher Co.*, 181 F.3d 645, 652 (5th Cir. 1999).  Nor does the court have to sift through the record in search of evidence to support opposition to summary judgment.  *Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998).

A motion for summary judgment cannot be granted merely because no opposition has been filed, even though a failure to respond violates a local rule.  *Hibernia National Bank v. Administracion Central Sociedad Anonima*, 776 F.2d 1277, 1279 (5th Cir. 1985), *citing John v. State of La. (Bd. of Trustees for State Colleges & Universities)*, 757 F.2d 698, 709 (5th Cir. 1985).  "The movant has the burden of establishing the absence of a genuine issue of material fact and, unless he has done so, the court may not grant the motion regardless of whether any response was filed.  *Id., citing id.* at 708. A decision to grant summary judgment based only on default is reversible error.  *Id.* Even if a plaintiff fails to file a response to a dispositive motion despite a local rule's mandate that a failure to respond is a representation of nonopposition, the Fifth Circuit has rejected the automatic granting of dispositive motions without responses without the court's considering the substance of the motion. *Watson v. United States*, 285 Fed. Appx. 140, 143 (5th Cir. 2008), *citing Johnson v. Pettiford*, 442 F.3d 917, 918 (5th Cir. 2006), and *Johnson v. Louisiana*, 757 F.2d 698, 708-09 (5th Cir. 1985).  "The mere failure to respond to a motion is not sufficient to justify a dismissal

with prejudice." *Id.*

Federal Rule of Civil Procedure 8(a)(2) provides, "A pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." When a district court reviews a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), it must construe the complaint in favor of the plaintiff and take all well-pleaded facts as true. *Randall D. Wolcott, MD, PA v. Sebelius*, 635 F.3d 757, 763 (5th Cir. 2011), *citing Gonzalez v. Kay*, 577 F.3d 600, 603 (5th Cir. 2009).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, . . . a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do . . . ." *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1964-65 (2007)(citations omitted). "Factual allegations must be enough to raise a right to relief above the speculative level." *Id.* at 1965, *citing* 5 C. Wright & A. Miller, *Federal Practice and Procedure* § 1216, pp. 235-236 (3d ed. 2004)("[T]he pleading must contain something more . . . than . . . a statement of facts that merely creates a suspicion [of] a legally cognizable right of action"). "*Twombly* jettisoned the minimum notice pleading requirement of *Conley v. Gibson*, 355 U.S. 41 . . .

(1957)["a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief"], and instead required that a complaint allege enough facts to state a claim that is plausible on its face." *St. Germain v. Howard*, 556 F.3d 261, 263 n.2 (5th Cir. 2009), *citing In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007)("To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead 'enough facts to state a claim to relief that is plausible on its face.'"), *citing Twombly*, 127 S. Ct. at 1974). *See also Alpert v. Riley*, No. H-04-CV-3774, 2008 WL 304742, *14 (S.D. Tex. Jan. 31, 2008).  "'A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Montoya v. FedEx Ground Package System, Inc.*, 614 F.3d 145, 148 (5th Cir. 2010), *quoting Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1940 (2009).  Dismissal is appropriate when the plaintiff fails to allege "'enough facts to state a claim to relief that is plausible on its face'" and therefore fails to "'raise a right to relief above the speculative level.'" *Montoya*, 614 F.3d at 148, *quoting Twombly*, 550 U.S. at 555, 570.

Dismissal under Federal Rule of Civil Procedure 12(b)(6) is "appropriate when a defendant attacks the complaint because it fails to state a legally cognizable claim." *Ramming v. United*

*States*, 281 F.3d 158, 161 (5th Cir. 2001), *cert. denied sub nom. Cloud v. United States*, 536 U.S. 960 (2002), *cited for that proposition in Baisden v. I'm Ready Productions*, No. Civ. A. H-08-0451, 2008 WL 2118170, *2 (S.D. Tex. May 16, 2008). *See also ASARCO LLC v. Americas Min. Corp.*, 382 B.R. 49, 57 (S.D. Tex. 2007)("Dismissal "'can be based either on a lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory.'" [citation omitted]), *reconsidered in other part*, 396 B.R. 278 (S.D. Tex. 2008).

**Pending Motions**

**1.  Shell Oil Company and Shell Offshore, Inc.'s (collectively, "Shell's") unopposed Motion for Summary Judgment (#145) and Motion to Consider #145 (#206)**

In a single, bare-bones paragraph, Plaintiffs allege that Shell negligently designed, engineered and implemented Platform 969, the platform in dispute, by locating the emergency shutoff device ("ESD")[4] too near the water and failed to raise it.  Shell notified Defendant Peregrine of the location and propensity to washout in high seas, and former Wood Group Production Services'

---

[4] Cal Rogers explained that an ESD "is a valve or a button you push off--or turn and it bleeds off the ESD lines and it shut--that causes wells to shut in.  It shuts in the platform . . . . They're all over the platform. . . So anywhere you are--you can find one to shut off if something goes wrong on the platform.  A fire or anything, you can shut that off.  It cuts off the wells.  It shuts down, you know, the generators, if there's generators."  #146, Rogers Dep., Ex. 9 at 63-64.

("WGPS'") employee Terryl Gipson testified that he repaired this particular ESD while Shell owned the platform, but neither Shell nor Peregrine Oil & Gas II, LLC ("Peregrine") raised the ESD until after Torres' death.  Torres was swept out to sea by a large wave while working on the ESD at issue and drowned.

Shell's motion argues that Shell owed no duty to Torres.  With documentary support, it states that it did not own, manage, possess, operate, control, lease, invest or have any other form of interest in the platform on North Padres Island Block 969, a drilling platform in the Gulf of Mexico.  Exhibit 1, U.S. Dept. of Interior, Minerals Management Service OCS Report, "Investigation of Fatal Accident North Padre Island Block 969, Platform JA OCS-G 5939, 19 January 2008.  It asserts that it was not involved with the Platform or the Decedent in any way other than the fact that it owned and operated the platform for a period of time up to six months prior to Torres' death.  Affidavit, Ex. 4.  It further explains that Peregrine purchased the underlying lease and platform from Shell, effective July 1, 2007, as well as all appertaining assets, liabilities, responsibilities, and obligations for its operation.  Ex. 8, Oct. 12, 2007 letter to the Department of the Interior from Peregrine.[5]  See also #299, Unsworn Declaration of

_____

[5] Shell states that it cannot refer to the Asset Purchase Agreement between Shell and Peregrine because of a confidentiality clause but would submit one to the Court *in camera* if the Court wishes.  Because no party has challenged Shell's motion for summary judgment, including Peregrine, and because Peregrine's motion for

Christopher D. Smith, Operations Manager for Shell.  Thus Peregrine became the owner and operator of the lease and the platform before the accident and death.  Moreover Peregrine had entered into an independent contractual relationship with the decedent's employer, Wood Group Production Services, Inc. (collectively known as "WGPS"), to perform work on the platform.  Ex. 1; *see also* #299, Smith Decl. at 2 ("Because Shell had no business relationship with Mr. Torres or Wood Group with respect to the Platform on or about January 19, 2008, Shell had no ability to control the manner in which Mr. Torres performed his work on that day.").  As the previous lessor of the platform, as a matter of law Shell owed no duty to Torres.

Shell argues, and the Court agrees, that the Outer Continental Shelf Lands Act ("OCSLA"), 43 U.S.C. §§ 1331-1356, rather than admiralty law, applies here because the accident occurred on a drilling platform located on the Outer Continental Shelf, and Texas negligence law, where not inconsistent with federal law, supplements the federal law here.  *Alleman v. Omni Energy Services Corp.*, 580 F.3d 280, 283 (5th Cir. 2009)(OCSLA applies to accidents occurring on oil platforms on the Outer Continental Shelf and applies adjacent state law as surrogate federal law on those platforms to the extent they are not inconsistent with federal

---

summary judgment (#125 at 8, with supporting documents) is in accord with Shell's representation regarding the contract, the Court will not require an *in camera* submission.

law); *Offshore Logistics, Inc. v. Tallentire*, 477 U.S. 207, 217 (1986), *citing Rodrigue v. Aetna Cas. & Sur. Co.*, 395 U.S. 352, 366 (1962)[6]; *Arsement v. Spinnaker Exploration Co., LLC*, 400 F.3d 238, 241-45 (5th Cir. 2005)(applying Texas negligence law to OCSLA action where accident occurred on offshore drilling platform adjacent to Texas). OCSLA applies even though Torres' actual death was in the sea because the accident originated on a drilling platform off the coast of Texas, and OCSLA situs, federal maritime law does not apply of its own force because Torres was not a maritime employee and his profession had not significant relation to a traditional maritime activity, and, as will be discussed, the applicable Texas law is not inconsistent with federal law. *Smith v. Pan Air Corp.*, 684 F.2d 1102, 1110 (5th Cir. 1982)("[W]e have applied OCSLA and, consequently, state law, to incidents in which platform works who were the victims of torts originating on these artificial islands were not actually injured or killed until they fell, jumped or were pushed into the surrounding seas."); *Oliver v. Aminoil USA, Inc.*, 662 F.2d 349, 350-51 (5th Cir. 1981)(*per curiam*)(OCSLA applies where worker slipped from drilling platform and fell into the sea), *cert. denied*, 456 U.S. 916 (1982); *Bible v. Chevron Oil Co.*, 460 F.2d 1218, 1219 (5th Cir. 1972)("Since the substance and consummation of

---

[6] OCSLA extends the laws and jurisdiction of the United States to the seabed and artificial islands on the outer Continental Shelf, and fixed drilling platforms on the Outer Continental Shelf are "artificial islands" under OCSLA. *Rodrigue*, 395 U.S. at 363.

the occurrence giving rise to the injuries sustained took place on the drilling platform, the fact that [decedent] ultimately wound up in the [sea] does not transform this 'land based' injury into a maritime injury."), *cert. denied*, 409 U.S. 9844 (1972); *Herb's Welding, Inc. v. Gray*, 470 U.S. 414, 425-26 (1985)(holding offshore platform worker not engaged in maritime employment); *Hufnagel v. Omega Serv. Indus., Inc.*, 182 F.3d 340, 352 (5th Cir. 1999)(work modifying offshore platform bears no significant relation to traditional maritime activity); *In re Dearborn Marine Serv., Inc.*, 499 F.2d 263, 272-76 (5th Cir. 1974)(holding that platform worker's death caused by an explosion on a platform bore no significant relation to maritime law even though the death occurred while the worker was located on a vessel in navigable waters).

Shell cannot be liable for the condition or operation of the platform unless it owned, occupied, possessed or controlled the platform at the time of Torres' death. *County of Cameron v. Brown*, 80 S.W. 3d 549, 554 (Tex. 2002). Prior owners who no longer occupy, manage or possess the property owe no duty to third-parties who are injured on their formerly owned premises. *See, e.g., Lefmark Mgmt. Co. v. Old*, 946 S.W. 2d 52, 54 (Tex. 1997); *Durham v. Zarcades*, 270 S.W. 3d 708, 712 (Tex. App.--Fort Worth 2008, no pet.).

Shell did not owe a duty to Torres because Shell had no ability to control his activities. *Redinger v. Living, Inc.*, 689

S.W. 2d 415, 418 (Tex. 1985); 95 Tex. Civ. Prac. & Rem. Code §
95.003.[7]   "Under Texas law, in the absence of a relationship
between the parties giving rise to the right of control, one person
is under no legal duty to control the conduct of another, even if
there exists a practical ability to do so." *Graff v. Beard*, 858
S.W. 2d 918, 920 (Tex. 1993).   Furthermore, generally owners of a
property do "not have a duty to see that an independent contractor
performs the work in a safe manner." *Redinger*, 689 S.W. 2d at 418.
Instead, a duty of care for employees of independent contractors
only arises when the ability to control that employee's actions
exists. *Id.*; 95 Tex. Civ. Prac. & Rem. Code § 95.003.   Torres was
an independent contractor on the platform over whom Shell had no
ability to exert control.

   After reviewing the record, the Court agrees with Shell's

---

[7] Section 95.003 provides,

A property owner is not liable for personal injury,
death, or property damage to a contractor, subcontractor,
or an employee of a contractor or subcontractor who
constructs, repairs, renovates, or modifies an
improvement to real property, including personal injury,
death, or property damage arising from the failure to
provide a safe workplace unless:

(1) the property owner exercises or retains some control
over the manner in which the work is performed, other
than the right to order the work to start or stop or to
inspect progress or receive reports; and

(2) the property owner had actual knowledge of the danger
or condition resulting in the personal injury, death, or
property damage and failed to adequately warn.

summation of the law and concludes that Plaintiff has failed to meet its burden of producing any evidence to raise a material factual issue regarding Shell's liability and that Shell has shown that it is entitled to summary judgment as a matter of law.   Thus the Court grants Shell's motion for summary judgment.   Therefore Shell's motion for the Court to consider the motion for summary judgment is now MOOT.

**2.   Rotorcraft Leasing Company, LLC and Malcolm Good's unopposed Motion for Summary Judgment (#134) and Motion to Consider #134 (#292)**

Again Plaintiffs allege a bare-bones claim, this time against Rotorcraft Leasing Company ("Rotorcraft") and Malcolm Good ("Good").   Plaintiffs assert that the weather conditions were so bad that Good, piloting Rotorcraft's helicopter at the time of the incident, had to abandon Torres in unsafe conditions on the platform because Good could not shut down the helicopter because of bad weather.   Good allegedly acted either with a specific intent to cause Torres substantial injury, or, although subjectively aware of the risk involved, proceeded with conscious indifference to the rights, safety or welfare of others, including Torres.

Rotorcraft and Good contend that they owed no duty to Torres as a matter of law once he had exited the helicopter and that any duty they originally owed him was met when they delivered Torres to Platform 969 to perform work for his employer, WGPS.   Plaintiffs

have not even identified the particular duty that they claim Rotorcraft and Good breached.  As an experienced offshore worker, Torres was responsible for judging the safety of his work and for determining what, if any, safety procedures should be followed. They insist that Torres' failure to follow established safety procedures was the cause of Plaintiffs' damages.

Rotorcraft and Good represent that Rotorcraft provides helicopter services to the oil and gas industry throughout the Gulf of Mexico.  On April 2, 2007, Rotorcraft and WGPS entered into a Master Fight Services Agreement (Ex. 2), for helicopter services to transport personnel and equipment for WGPS.  Rotorcraft's obligation was to have helicopters available during the time period specified by WGPS.

Rotorcraft and Good state that on January 19, 2008, Torres was on duty on Platform JA, PN Block 975 ("NPI-975"), a platform leased by Peregrine, with fellow WGPS employee and Lead Operator Earl Hodges.  Ex. 1-B, Dep. of James Fancher at p. 25, ll. 16-25, APPX 026; Ex. 3, U.S. Dept. of Interior, Minerals Management Service OCS Report ("Report"), APPX 049-APPX 050; Ex. 1-B, Deposition of Clyde Self, at p. 65, ll. 7-10, APPX 020.  That same day Good transported WGPS employee Cal Rogers to NPI-975 from Polacios, Texas.  Ex. 2, Affidavit of Rotorcraft, APPX 037.  On arrival, Rogers helped unload groceries from the aircraft, and then Rogers and Torres

boarded the helicopter to go to Platform 969.[8]  Ex. 1-A, Dep. of
Cal Rogers at p. 45, ll. 12-23, APPX 005; Ex. 2, Affidavit of
Rotorcraft, APPX 037.   Rogers' job on the Platform 969 was to
perform fire, gas, and nav-aid inspections, while Torres was
directed to fix a tripped ESD on the platform.   Ex. 1-A, Dep. of
Rogers, at p. 36, ll. 15-21, and at 62, l.23-p. 63, l.7, APPX 004
and 008; Ex. 3, Report, APPX 053.   The helicopter arrived at
approximately 8:50 a.m., Rogers and Torres safely deplaned, and
Good returned to NPI-975 to await Torres and Rogers' completion of
their jobs.   On that day the weather at Platform 969 was reported
as 35-knot winds, 8-foot seas, and overcast clouds at 1,200 feet.
Ex. 3, Report at APPX 052.   Rogers testified that he and Torres
thought it was safe to perform work on the platform and that they
did not tell Good that they did not want to go to the platform as
planned.   Ex. 1-A at 237, ll. 4-13 and ll. 24-p. 238, l. 12, APPX
016.   Torres was the senior employee and only operator present on
the platform and therefore was the person in charge with the
responsibility to perform a job safety analysis ("JSA").   Ex. 1-A,
Rogers Dep. at p. 237, ll. 18-20, APPX 016; at 277, ll. 2-10, APPX
018; at 277, l. 20-p. 278, l.2, APPX 018; Ex. 1-B, Dep. of Self, p.
219, l.25-p. 220, l.4, APPX 022, and p. 226, ll. 4-8, APPX. 024.
See also Ex. 1-B, p. 218, l. 21-p. 219, l. 8, APPX 022 (explaining
that a JSA should be completed at the particular work site because

---

[8] Peregrine owns both the 975 and 969 platforms.

the purpose of a JSA is to identify and eliminate hazards), and at p. 225, ll. 15-20 (Torres was the person in charge because he was the only operator present on the 969 platform).  Nevertheless, a JSA was not performed that day.  Ex. 1-A. Rogers Dep., at p. 277, ll. 2-10, and  at p. 277, l. 20-p. 278, l. 2, APPX 018; Ex. 1-B, Dep. of Self, p. 219, l.25-p. 220, l. 4, APPX 022, at p. 226, ll. 4-8, APPX 024, and at p. 218, l. 21-p. 219, l. 8, APPX 022. Furthermore, neither Torres nor Rogers exercised their stop work authority[9] at any point on that day.   Ex. 1-A, Rogers Dep., p. 277, ll. 12-19, and p. 278, l. 14-p. 279, l. 2, APPX  018; Ex/ 3, Report  APPX 055; Ex. 1-B, Self Dep. at p. 214, ll. 14-24, APPX 021, and at p. 221, l. 24-p. 222, l. 21, APPX 023 (stating that even if Hodges had told Torres how to perform his job, if Torres felt it was not safe because of weather conditions, Torres should have exercised his stop work authority).  Defendants contend that "[a]s the person most aware of the risks associated with his work and the weather on the Platform in the date in question, Mr. Torres had the ultimate authority and responsibility to determine if at any point his assigned task could not be completed safely."  #134 at 9, citing Ex. 1-A, Rogers Dep., p. 278, ll. 4-10, APPX 018, and p. 239, ll. 3-23, APPX 016.

---

[9] Defendants state that "stop work authority" is "a Wood Group policy that gives *any* Wood Group employee the right to stop work if the employee perceives his work to be unsafe in any manner."  #134 at 8-9, citing Ex. 1-B, Self Dep., p. 68, ll. 17-21, Appx 020.

Rogers also testified that he saw Torres working on the stairway between the main deck and the boat landing without a flotation device. Ex. 1-A, Rogers Dep., p. 76, ll. 10-25, APPX 009. Torres was required to wear a flotation device because of the location of the platform. Ex. 1-A, Rogers Dep., p. 240, l. 17-p. 242, l. 1, APPX 016-017, p. 241, l. 17-p. 244, l. 24, APPX 017; Ex. 1-E, Dep. Ex. No. 14, APPX 032; Ex. 1-F Dep. Ex. No. 16, APPX 030; Ex. 1-B, Self Dep. at p. 216, ll. 8-17, APPX 022. Rogers and Torres worked for approximately twenty to thirty minutes before a large wave hit the platform. Rogers heard Torres yelling and saw that Torres had been swept overboard. Ex. 1-A, Dep. of Rogers, at p. 218, ll. 1-5, APPX 012, at p. 221, ll. 5-20, APPX 013, at p. 222, ll. 14-21, APPX 013; Ex. 3, Report, APPX 054. Rogers threw a buoy to Torres and gave notice of man overboard to NPI-975, and then threw a personal floatation device to Torres, but Torres was unable to reach either the buoy or the flotation device. Ex. 1-A, Rogers Dep., p. 221, ll. 5-20, APPX 013, at p. 231, ll. 13-19, APPX 014, at p. 233, ll. 8-13, APPX 015; Ex. 3, Report, APPX 054. Rogers testified that after about two minutes, Torres was floating face down. Ex. 1-A, Rogers Dep., p. 221, ll. 5-20, APPX 013, at p. 231, ll. 13-19, APPX 014, at p. 233, ll. 8-13, APPX 015; Ex. 3, Report, APPX 054. When Good received the notice of man overboard, he flew Hodges, who was on NPI-975 three miles from Platform 969, to Platform 969, where they hovered over Torres' body until the

helicopter required refueling.  Ex. 1-A, Rogers Dep., p. 194, l.8-p. 195, l.7, APPX 010; Affidavit of Rotorcraft, APPX 037.  Good picked Rogers up from the platform and took him back to NPI-975.  Ex. 1-A, Rogers Dep., p. 194, l. 8-p. 195, l. 7, APPX 010; Ex. 2, Affidavit of Rotorcraft, APPX 037.  Good returned to the 969 platform and waited there until the Coast Guard arrived.  *Id.*  Torres was pronounced dead at Spohn Memorial Hospital in Corpus Christi, Texas.  Ex. 3, Report, APPX 048.

Also asserting that OCSLA and Texas law, as surrogate federal law under OCSLA, apply here, Good and Rotorcraft maintain that they did not breach any duty owed to Torres.  They safely delivered Torres to the platform, discharging any duty they might have to him, contractual or otherwise.  After that they did not owe any duty to him because they had no control over any aspect of Torres' work or the platform, as evidenced by Good's flying the helicopter back to NPI-975 to await Torres' completion of his work.

The Texas Transportation Code requires that aircraft be operated safely.  Tex. Transp. Code Ann. § 21.006(a).  The state law measure of care required in the operation of an aircraft is ordinary care under the circumstances, i.e., "the care which an ordinary prudent or reasonably careful pilot or operator would use under the same or similar circumstances." 8A Tex. Jur. 3d Aviation § 48.  Good and Rotorcraft maintain that they met that standard of care in safely transporting Torres to the 969 platform.

Even if they were held to a higher standard, i.e., that imposed on commercial carriers, they did not breach that duty. A common carrier owes its passengers the degree of care that a "very cautious, prudent and competent person would use under the same or similar circumstances." *Slentz v. American Airlines, Inc.*, 817 S.W. 2d 366, 369 (Tex. App.--Austin 1991, pet. denied). The Texas Transportation Code requires only that aircraft be operated safely. Tex. Transp. Code Ann. § 21.006(a). The carrier's duty extends through the boarding and unloading process. *Id*. Here Rotorcraft and Good flew the helicopter safely to the platform and Torres exited the helicopter safely; thus Rotorcraft and Good satisfied the duty owed by common carriers.

Not only did Rotorcraft and Good not owe a duty to Torres while he was working on the platform for WGPS, but they had no ability to control the tasks assigned to Torres or any WGPS employee, as evidenced by Good's return to NPI-975 while Torres did his work on platform 969, and they also did not have superior knowledge of any risks associated with the platform or Torres' work on it on the day of the incident. Indeed, if anyone had superior knowledge of the risk, it was Torres, an experienced employee, the person in charge that day, with stop work authority that he chose not to use, and the exclusive responsibility to determine whether his job was safe to perform that day. Ex. 1-A, Dep. of Cal Rogers, o. 278, ll. 4-10, APPX 018, p. 237, ll. 18-20, p. 239, ll. 3-23

APPX 016.   *See Rocha v. Faltys*, 69 S.W. 3d 315, 321-22 (Tex. App.--Austin 2002, no pet.)(In determining if a duty should be imposed, the court "must weigh the risk, foreseeability, and likelihood of injury against social utility of the actor's conduct, the magnitude of the burden of guarding against the injury, and the consequences of placing the burden on the defendant" and "whether one party had superior knowledge of the risk or a right to control the actor who caused the harm.").  Nor did Rotorcraft or Good operate or control the platform on which Torres was working.  See generally Exhibits 1-D, Dep. of Thomas O. Motschman, p. 237, ll. 14-17, APPX 031; 1-C, Dep. of James Fancher, p. 24, ll.8-25, p. 25, ll. 16-25, APPX 027; Ex. 1-A, Dep. of Cal Rogers, p. 237, ll. 18-20, APPX 016, p. 277, ll. 2-10, APPX 018, and p. 277, l.20-p.278, l.2, APPX 018; Ex. 1-B, Dep. of Clyde Self, p. 225, ll. 15-20, APPX 024(explaining Torres was the person in charge of the 969 platform because he was the only operator on it at that time).

Nor is it possible for a transportation company like Rotorcraft to reasonably foresee the different ways an offshore employee may be injured while performing his job, no less that Torres would ignore risks that his experience should have made him cognizant of or that Torres would fail to follow established safety regulations.  "Texas common law is fundamentally premised on individuals' responsibility for their own actions."  *Carter v. Abbyad*, 299 S.W. 3d 892, 901 (Tex. App.--Austin 2009, no pet.).

Rotorcraft and Good did not have a duty to rescue Torres after he was swept into the water. Texas law provides that "an individual is under no legal duty to come to the aid of another in distress . . . ." *Pinkerton's v. Manriquez*, 964 S.W. 2d 39, 46 (Tex. App.--Houston 1998, pet. denied). Even if they had been on the platform when Torres was swept away, they would be categorized as mere bystanders with no duty to rescue Torres. "[A] mere bystander who did not create the dangerous situation is not required to become the good Samaritan and prevent injury to others." *Texas Dept. of Trans. v. Fontenot*, 151 S.W. 3d 753, 760 (Tex. App.--Beaumont, 2004, pet. denied). "[S]imply taking . . . an adult man to the location where [he] could choose to engage in an allegedly dangerous activity does not constitute negligent creation of a dangerous situation." *Rocha v. Faltys*, 69 S.W. 3d 315, 321 (Tex. App.--Austin 2002, no pet.).

The Court concludes that Good and Rotorcraft have met their burden here and established as a matter of law that they owed no duty to Torres and therefore no legal liability can arise based on negligence. Plaintiffs have failed to respond and to satisfy their burden to raise a genuine issue of material fact to avoid summary judgment. Therefore the Court concludes that Good and Rotorcraft are entitled to summary judgment. Their motion for the Court to consider their motion for summary judgment is now moot.

3. **WGPS's Motion to Dismiss Under Federal Rules**

of Civil Procedure 12(b)(6) and 12(e) (#156)

WGPS complains that Plaintiffs have not fully complied with the Court's June 2, 2011 Opinion and Order (#124), granting dismissal of all claims against Prosafe, LP and Wood Group Management Services; it also dismissed the negligence claim against WGPS on the grounds it is barred by the exclusive-remedy provision of the Texas Workers' Compensation Act ("the Act"), Texas Labor Code § 408.001(a), for ordinary negligence claims for injury or death occurring during the course and scope of the employee's work responsibilities since WGPS, as Torres' employer, subscribes to workers' compensation insurance, and the conspiracy claim against Prosafe, LP and WGPS.  In addition it granted WGPS' motion for more definite statement and ordered Plaintiffs to provide more facts distinguishing the remaining plausible claims against each Defendant and identifying the purported wrongful death beneficiaries or to show good cause why they could not do so.  WGPS objects that the Second Amended Complaint still refers to negligence, strict liability against WGPS, "negligence and as applicable, gross negligence of the Defendants," joint and several liability, and strict liability for inherently hazardous and/or dangerous activity.  It insists that the Act bars suit against WGPS except for exemplary damages.  Thus "out of an abundance of caution," it seeks express dismissal of all Plaintiffs' claims and causes of action against WGPS for or premised upon negligence,

-23-

strict liability, and/or joint and several liability.

*Plaintiffs' Response (#193)*

Plaintiffs insist that they did not intend to assert, nor does the Second Amended Complaint assert, claims of negligence against WGPS.  They do plead gross negligence and exemplary damages against WGPS pursuant to the Texas Constitution.

*WGPS' Reply (#243)*

WGPS repeats that the complaint refers to negligence and strict liability claims against WGPS and that it simply seeks clarification and an express dismissal against it of what appears to be asserted against "Defendants" generally.  Only a claim for gross damages and any associated exemplary damages can be asserted against WGPS.

WGPS also objects to Plaintiffs' continuing to plead claims for "phantom" heirs when they admit, "Plaintiff[] specifically pled that she knows of no other heir" and that "Plaintiff decedent (Paul Torres)'s only child, P.D.T., [is] the sole heir of Decedent's estate."

*Court's Decision*

The Court finds that WGPS's legal arguments are correct.  *See, e.g., Port Elevator-Brownsville, LLC v, Caseates*, ___ S.W. 3d ___, 2012 WL 247985, *2 (Tex. Jan. 27, 2012); *Reed Tool Co. v. Capelin*, 689 S.W. 2d 404, 406 (Tex. 1985)(The Texas Workers' Compensation Act is the exclusive remedy for employees against subscriber

employers for work-related injuries with the exception of intentional injury.). An intentional injury occurs when "the actor desires to cause the consequences of his act" or "believes that the consequences are substantially certain to result from it." *Rodrigue v. Baylor Indus., Inc.*, 763 S.W. 2d 411, 412 (Tex. 1989), *quoting Restatement (Second) of Torts* § 8A (1965).

Section 408.001(a) of the Texas Labor Code states, "Recovery of workers' compensation benefits is the exclusive remedy of an employee covered by workers' compensation insurance coverage or a legal beneficiary against the employer or an agent or employee of the employer for the death of or a work-related injury sustained by the employee." Section 408.001(b) provides, "This section does not prohibit the recovery of exemplary damages by the surviving spouse or heirs of the body of a deceased employee whose death was caused by an intentional act or omission of the employer or by the employer's gross negligence."[10]  To expressly clarify the matter,

---

[10] The Court is aware that under 28 U.S.C. § 1445(c)("A civil action in any State court arising under the workmen's compensation laws of such State may not be removed to any district court of the United States."), claims that arise under the Texas Workers Compensation Act may not be removed to federal court regardless of whether jurisdiction is based on diversity or federal question. *Sherrod v. American Airlines, Inc.*, 132 F.3d 1112, 1118-19 (5th Cir. 1998).  The estate's gross negligence claim against employer WGPS arises under the Texas Workers Compensation Act and may not be removed under 28 U.S.C. § 1445(c).  *Del Carmen Aspersa v. Jozwiak*, 391 F. Supp. 2d 504, 508 (E.D. Tex. 2005)(and cases cited therein). Removal of such claims, however, is a procedural defect and any objection to removal on that ground is waived if it is not asserted within thirty days of removal.  *Sherrod*, 132 F.3d at 1117.  *See also McCarter v. Rescar Industries, Inc.*, Civ. No. H-10-1512, 2010

the Court will grant the motion to dismiss and explicitly order that all Plaintiffs' claims and causes of action against WGPS based on negligence, strict liability and/or joint and several liability, or inherently hazardous or dangerous activity are dismissed.  As for identifying the beneficiary, the Court finds that Plaintiff has identified P.D.T. as the sole heir of Torres' estate and is bound by that identification.  If Plaintiff seeks to amend to add any other alleged heirs in the future, she will have to show good cause and obtain the Court's approval.

**4.   WGPS's Motion for Partial Summary Judgment (#146)**

As indicated, Plaintiffs' claims against WGPS, Torres' employer which subscribed to Worker's Compensation, are limited to gross negligence and exemplary damages.  WGPS notes that the Worker's Compensation Act defines "gross negligence" in § 41.001(11), Texas Civil Practice and Remedies Code, as an act or omission

> (A) which when viewed objectively from the standpoint of the actor at the time of its occurrence involves an extreme degree of risk, considering the probability and magnitude of the potential harm to others; and
>
> (B) of which the actor has actual, subjective awareness of the risk involved, but nevertheless proceeds with conscious indifference to the rights, safety, or welfare

---

WL 3825407, *1-2 (S.D. Tex. Sept. 27, 2010).  Although Plaintiffs filed a timely motion to remand in this action, it was based on Defendants' failure to obtain consent of all served parties.  Thus the Court finds that Plaintiffs waived their right to object to removal of the gross negligence and malice claims arising from the Workers Compensation Act.  *McCarter*, 2010 WL 3825407 at *1-2.

of others.

Section 41.003(a) further requires that the "claimant prove[] by clear and convincing evidence that the harm with respect to which the claimant seeks recovery of exemplary damages results from: (a) fraud; (2) malice; or (3) gross negligence."

WGPS argues that because WGPS was not grossly negligent and did not engage in malice in regard to Torres' death,[11] and because there is no competent, legally sufficient evidence to support the objective or subjective elements of those claims, WGPS is entitled to summary judgment as a matter of law. WGPS further insists that

---

[11] With photographs and supporting documents, WGPS highlights the fact that Torres had been promoted to operator around December 2006 and was therefore experienced, that he was the only operator on Platform 969 and was therefore the supervisor and senior person in charge of the 969 platform at the time of the accident (Dep. of Cal Rogers, #146, Ex. 9, pp. 214-16, 277-79; Barnidge Dep., #249, Ex. 1 at 37-38), that Torres was the only person in a position to know the actual conditions where he chose to work on the 969 platform that day, that Torres decided to perform the work near the water level without wearing a required life preserver or any personal floatation device ("PFD") despite the threatening weather conditions, and that he failed to follow several WGPS safety policies. At least three times on the day of the accident Torres walked by an orange box labeled "LIFE JACKETS" and ignored a sign requiring PFDs beyond that point, he failed to perform a JSA before starting work that day, and he failed to exercise his stop work authority, procedures that are designed to eliminate or limit risk. WGPS insists it is a safety conscious company that trains its employees on safety considerations and provides them with "Near Miss Reports & Offshore Handbooks" (Ex. 7) containing various company policies and safety rules. Cal Rogers and the former lead operator Terryl Gipson were of the opinion that Torres did not act reasonably for his own safety that day by working below the main deck without wearing a PDF life jacket. Exhibits 9 (Rogers Dep. at 255) and 10 (Gipson Dep.) at 324-25, 345.

documents attached to WGPS' motion demonstrate that it was not grossly negligent, nor did it act with malice.  Thus Plaintiffs' claims and causes of action against WGPS should be dismissed in their entirety.

WGPS observes that to establish gross negligence, "the act or omission complained of must depart from the ordinary standard of care to such an extent that it creates an extreme degree of risk of harming others." *Columbia Med. Ctr. Of Los Colinas, Inc. V. Hogue*, 271 S.W. 3d 238, 248 (Tex. 2008).  Evidence of simple negligence is insufficient to prove either the objective or subjective elements of gross negligence. *Mobil Oil v. Ellender*, 968 S.W. 2d 917, 921 (Tex. 1998); *Universal Servs. Co. V. Ung*, 904 S.W. 2d 638, 641 (Tex. 1995); *see also Transportation Ins. Co. v. Moriel*, 879 S.W. 2d 10, 22-23 (Tex. 1994).

The objective first prong of  § 41.001(11) requires that the extreme risk not be merely a remote possibility of injury or even a high probability of minor harm, but instead the likelihood of serious injury to the plaintiff. *Ellender*, 968 S.W. 2d at 921; *Ung*, 904 S.W. 2d at 641; *Moriel*, 879 S.W. 2d at 22.  The risk must be viewed prospectively from the perspective of the actor, not in hindsight. *Ellender*, 968 S.W. 2d at 921; *Ung*, 904 S.W. 2d at 641; *Moriel*, 879 S.W. 2d at 22-23. "Actual awareness" means that the defendant knew about the peril, but its acts or omissions demonstrated that it did not care. *Ellender,* 968 S.W. 2d at 921.

Furthermore Section 41.001(7) of the Texas Civil Practice and Remedies Code defines "malice" as "a specific intent by the defendant to cause substantial injury or harm to the claimant." WGPS insists there is no competent, legally sufficient evidence here that WGPS had "a specific intent . . . to cause substantial injury or harm" to Torres.  The Court agrees.  Nor is there evidence of fraud.  Thus only gross negligence remains a possible issue for recovery of exemplary damages.

Plaintiffs must prove gross negligence (and/or malice) by clear and convincing evidence (§ 41.003(a) and (b)), which is defined as "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established."  Tex. Civ. Prac. & Rem. Code § 41.001(2).  That burden of proof may not be shifted to the defendant or satisfied by evidence of ordinary negligence or bad faith.  *Id.*, § 41.003(b)

In sum, argues WGPS, not only is there no adequate evidence to raise a genuine issue of fact to support Plaintiffs' claims that WGPS was grossly negligent or engaged in malice, but the evidence establishes the contrary:  (1) that WGPS did not engage in any act or omission which, objectively from WGPS' standpoint at the time of the incident, involved an extreme degree of risk in view of the probability and magnitude of the potential harm to others; (2) WGPS denies having actual, subjective awareness of the risk involved but

nevertheless proceeding with conscious indifference to the rights, safety or welfare of others; and (3) WGPS did not have a specific (malicious) intent to cause substantial injury or harm to Torres. Torres, himself, decided to do the work, chose where to do it (boat landing level area) despite the actual wave conditions on the platform at that time and that his pants were getting wet from the ocean spray, without performing a JSA, without exercising "Stop Work Authority," without wearing the required life preserver, and in violation of common sense and WGPS safety policies. WGPS points out that there is no evidence that any other WGPS employee has drowned or sustained serious injury under any circumstances, no less in circumstances similar to those at the time of Torres' drowning. Thus Plaintiffs have not and cannot meet their summary judgment burden to raise a genuine issue of material fact based on clear and convincing evidence that WGPS engaged in malice or was grossly negligent. Thus these claims fail as a matter of law.

*Plaintiffs' [Corrected] Response (#198)*

Agreeing that the only causes of action Plaintiffs may assert against Torres' employer, WGPS, are gross negligence and exemplary damages,[12] Plaintiffs insist that there is no evidence that WGPS

[12] The Court notes that while employees generally may not recover punitive damages from their employers in workers' compensation cases, § 408.001(a)("Recovery of workers' compensation benefits is the exclusive remedy of an employee covered by workers' compensation insurance coverage or a legal beneficiary against the employer or an agent or employee of the employer for the death of or a work-related injury sustained by the employee."), the estate

exercised any care at all on the date of Torres' death or WGPS would have provided that evidence.  Nor does WGPS say how Plaintiffs' gross negligence or malice claims are defeated other than to assert that Torres made the decision to do the work and where to do it, without first performing a JSA, without exercising stop work authority, and without wearing a life preserver, in violation of common sense and WGPS' policies.

It is well established that a plaintiff's contributory negligence does not bar his recovery of exemplary damages. *Pedernales Electric Co-op., Inc. v. Schulz*, 583 S.W. 2d 882 (Tex. App.--Waco 1979, writ ref'd n.r.e.).  Furthermore, for purposes of liability, plaintiff's conduct is irrelevant to determining if punitive damages should be awarded because "[i]n Texas the overriding policy consideration in the award of exemplary damages is as punishment for gross negligence as distinguished from compensation." *Id.* at 884-85.  *See Service Corp. Intern. v. Guerra,* 348 S.W. 3d 221, 238 (Tex. 2011)(purpose of punitive damages "to deter and punish culpable conduct").

Plaintiffs contend that Torres' supervisor, Earl Hodges, not Torres, was the person in charge ("PIC"), that Hodges decided what

---

of a deceased employee (here the estate of Paul Torres) may do so if the employer's willful acts or omissions resulted in the death of the employee.  Section 408.001(b) of the Texas Workers Compensation Act, Texas Labor Code Ann. (Vernon 2006), provides, "This section does not prohibit the recovery of exemplary damages by the surviving spouse or heirs of the body of a deceased employee whose death was caused . . . by the employer's gross negligence."

Torres should do and where to do it, and that Hodges "did exactly
what his supervisor told him to do." WGPS's Incident Sheet (#198,
Ex. 2) lists Torres' supervisor, Earl Hodges, as the PIC of this
work. Defendant WGPS, however, points out that the two references
in that document also specify the location, "Person In Charge-NPI-
975," not on the 969 platform. See also Dep. of Jack Barnidge,
#249, Ex. 1 at p. 28, ll. 7-11; at p. 31, ll. 15-25; at p. 37, l,
16-p. 38, l.1 (Hodges was PIC on 975 platform). When Hodges was
asked in his interview with J. Connor Consulting after the
incident, "Please state your position and responsibilities on the
day of the incident," Hodges responded, "PIC (person in charge)."
Above that question and  answer is written, "Earl Hodges-PN 975
Lead Operator-(Not on Scene)." Hodges was on NPI-975 when the
accident occurred on the 969 platform, three miles away from the
975 platform. Evidence supports the fact that Hodges remained on
NPI-975 until after the accident (Exhibit 4(1), Report, Ex. 1 at
6).

Nevertheless Plaintiffs argue that there is no evidence that
anyone other than Hodges was in charge of the work being done that
day; Hodges chose to do the repair work that day, after the 969
platform had been shut down for several days because of the high
seas and strong winds, as well as where the ESD should be placed.
Exhibits 4, 6, 9. In his investigation statements, Hodges stated
that he had given specific work instructions to Torres "to put the

ESD station nine feet off the water." Ex. 4. Cheryl Sue also testified that Hodges stated that he gave special instructions to Torres on that day "to put in EDS station nine feet off the water." Exhibit 12.

Regarding the JSA safety analysis that was never done, Plaintiffs point out that during the interview Hodges was asked, "did you conduct a JSA discussion with Mr. Rogers and Mr. Torres prior [to] them departing for 969 PF?" Hodges responded, "No." Ex. 4 at 2. As the person in charge, they argue, Hodges, not Torres, had the responsibility to perform the JSA on the 969 platform. They also emphasize that neither Hodges, nor Rogers, nor Torres exercised the stop work authority that each had.

Furthermore despite WGPS's charges, Plaintiffs argue that it would not have made a difference if Torres had worn a life preserver because Plaintiffs' medical expert, Michael Baden testified that Torres died of cold water shock after being in the water. Ex. 6, Madeley Aff. at 3-4; Ex. 7, Dep. of Michael Baden, M.D. at 47-48 (first opinion that Torres died from cold water shock and even if he had been wearing a life vest he would have died). Thus what was needed was some equipment to keep him from falling into the water, such as a harness, a means of tying off with fall protection, or a railing, but there was none.

Plaintiffs contend that Hodges was grossly negligent because he admitted that he had actual knowledge from a weather report that

the winds were gusting "30-40" and the seas were eight to ten feet high, yet he ordered Torres to put in the EDS at nine feet, where ten foot waves could kill him.  Plaintiffs point out that according to notes taken by Cheryl Sue during an investigatory interview of Hodges about the incident for Peregrine, a distressed Hodges stated that "it should have been him [Hodges].  He should have gone there."  Cheryl Sue Dep., Ex. 12 at 97, ll. 5-6.  Plaintiffs represent without supporting evidence that Hodges committed suicide shortly after the investigation.  The point out that Hodges also admitted there was pressure from his supervisors to get the work accomplished quickly because Peregrine and WGPS had stopped work on the 969 platform the previous days because of bad weather conditions and the damaged EDS.  Ex. 4 at 1; Affid. of Madeley, Ex. 6 at 5.  Plaintiffs argue that Hodges' decision, with actual knowledge that the seas were eight to ten feet high at Platform 969, to perform the work, and his specific order where it was to be done in rough sea conditions, involved an extreme degree of risk, satisfying the first prong of gross negligence.  Ex. 6, affidavit of Jack Medley; Barnidge Dep., Ex. 8 at 186, ll. 1-1.  The Court observes that Plaintiffs ignore Sue's notes stating that in response to the question, "In view of the weather conditions did you think it was safe for the crew to be working on the 969 PF on the morning of the incident?," Hodges responded, "Yes  had planned to go himself."  Ex. 4 at 3.

Plaintiffs argue that they satisfy the other prong of § 95.003 in Hodges' instruction to Torres on January 19, 2008 to "move up the ladder and put in the ESD station nine feet off the water" when Hodges knew there were ten-foot waves.  Barnidge Dep., Ex. 9, p. 253, ll. 7-15.; Affid. of Plaintiff's safety engineering expert Jack Madeley, Ex. 6.  Ex. 3 at 3.  Plaintiffs argue that at nine feet off the water, an eight-foot wave would not hit Torres, but a ten foot-wave would.

Plaintiffs assert that WGPS's failure to provide Torres with a lifeline or safety harness to prevent him from falling into the water under the conditions described supports their claim of gross negligence.  *See Lee Lewis Const., Inc. v. Harrison*, 70 S.W. 3d 778 (Tex. 2001)(evidence supported finding that when objectively viewed from the general contractor's standpoint, the general contractor's knowledge of the extreme risk of fatal falls for subcontractor employees installing windows on a high rise building when they were using only safety belts and lanyards without independent lifelines, but conscious choice to do nothing to require proper safety equipment for fall protection, constituted gross negligence). Plaintiffs assert that there was no equipment available on the platform that would have completely prevented Torres from falling into the water.  Affid. Madeley, Ex. 6 at 5.

Plaintiffs further argue that a combination of factors here constituted gross negligence.  *See Burk Royalty v. Walls*, 616 S.W.

2d 911, 922 (Tex. 1981)("[T]he existence of gross negligence need not rest upon a single act or omission, but may result from a combination of negligent acts or omissions, and many circumstances and elements may be considered in determining whether an act constitutes gross negligence.  A mental state may be inferred from the actions."); *Granite Construction Co. v. Mendoza*, 816 S.W. 2d 756, 764 (Tex. App.--Dallas 1991).  They point to (1) the absence of fall protection, (2) no requirement to wear fall protection under the circumstances, (3) no safety analysis (JSA) performed, (4) no plan to safely perform the work, (5) "it was the worst day to work," and (6) Hodges and Torres failed to exercise their stop work authority.  Plaintiffs claim they have provided evidence that nothing was done correctly on the day of Torres' death and that WGPS had actual knowledge of the risks, but did not care. Plaintiffs insist they have raised sufficient fact issues about gross negligence to preclude summary judgment.

*WGPS's Reply (#248 and 249)*

After reiterating much of its motion for summary judgment, WGPS insists Plaintiffs have failed to submit competent evidence to show anything more than ordinary negligence and to raise a genuine issue of fact regarding gross negligence.  Plaintiffs have failed to show that WGPS was actually, subjectively aware at the time of the following: (a) that the actual reason, rather than a possible or suspected reason, that the 969 platform was shut down before the

-36-

day of Torres' death was due to an ESD located on a stairwell above the platform boat landing; (b) that Torres would decide a repair of that particular EDS was feasible; (c) that Torres would leave the main deck of platform 969 and go to the boat landing level area to work, given the actual wave conditions at platform 969, which were clearly obvious to Torres, the only operator on the 969 platform, but which were unknown to WGPS; (d) that Torres would not choose other available and known means to bring the 969 platform online, e.g., installing a temporary plug at or near the main deck level; (e) that Torres would choose to work where his pants were getting wet from ocean spray; (f) that Torres would not exercise Stop Work Authority in the event he was faced with a potentially unsafe condition or job; (g) that Torres would ignore WGPS's company policy and the posted instructions on the platform ("PDF'S REQUIRED BEYOND THIS POINT") by not wearing a life preserver/PDF (#146, Exs. 1, 2, 3, 9 (at p. 156/l.18-p. 159/l.18, p. 240/l.17-p. 244/l.4, p. 240/l.17-p. 247/l.4), and 10 (at p. 392/ll.8-15, p. 393/ll.15-19)); (h) that after working for about twenty-five minutes without injury, Torres would place himself in a position where he was likely (rather than potentially likely)[13] to be swept off the 969

---

[13] *Wal-Mart Stores, Inc. v. Alexander*, 868 S.W. 322, 327 (Tex. 1993)(finding no evidence that Wal-Mart's conduct created an extreme risk of harm because the store averaged 50,000 customers per month in the three months it had been open before Alexander's fall, there was no evidence that anyone had tripped and fallen over the ridge before she did, and the evidence showed that only one person had stumbled there).

platform by a large wave and that he would not be wearing a life
preserver/PDF; and/or when viewed objectively from the standpoint
of WGPS at the time, that WGPS engaged in any act or omission that
involved an extreme degree of risk of drowning, of which WGPS was
actually, subjectively aware, but that WGPS' actions demonstrated
that WGPS did not care about the consequences to Torres of a known,
extreme risk of drowning.[14]   There is no evidence that any other
WGPS employee has drowned or sustained serious injury under any
circumstances, much less in any circumstances similar to those at
the time of Torres' accident.

WGPS also challenges Plaintiffs' assertion the WGPS did not
provide any evidence of care even though it is not required to do
so.[15]   As movant for summary judgment, WGPS only has to show the
absence of any genuine material fact issue; it does not have to
negate the elements of Plaintiffs' claims where Plaintiffs bear the
burden of proof at trial.  Nevertheless, WGPS has provided evidence
of steps it took in the exercise of ordinary care, e.g., safety
policies and training, Stop Work Authority, availability of PFDs,

---

[14] *See Ardoin v. Anheuser-Busch, Inc.*, 267 S.W. 3d 498, 503-04
(Tex. App.--Houston [14th Dist.] 2008, no writ)(finding less than
a scintilla of evidence that the defendant was subjectively aware
that, in the absence of guards, employees might enter the
dispensing area of a palletizer machine, while it was activated,
such that defendant's failure to provide guards to prevent entry
demonstrated that it did not care about the consequences to the
decedent employee of a known extreme risk of danger).

[15]   The Court agrees that Plaintiffs misrepresent WGPS' burden
on summary judgment.

and warning sign requiring the wearing of PDFS when walking down the stairwell from the main deck of the 969 platform).

On the other hand, argues WGPS, the summary judgment evidence in the record establishes that (a) WGPS did not engage in any act or omission which, when viewed objectively from WGPS's perspective at the time of the accident, involved an extreme degree of risk in view of the probability and magnitude of the potential harm to others; (b) WGPS did not have actual, subjective awareness of the risk involved nor proceed with conscious indifference to the rights, safety or welfare of others; and (c) WGPS did not have a specific, malicious intent to cause substantial injury or harm to Torres.  Even though Plaintiffs argue that Hodges knew or even could have known the actual conditions on Platform 969, Hodges was three miles away from the 969 platform, raising questions how he could have known the actual conditions on that platform, much less later when Torres got there and decided to work on it.  Dep. of Jack Barnidge, #249, Ex. 1 at p. 42, ll. 6-11 (wind speeds and sea conditions can "vary all kind of way" within two miles in the sea); Ex. 11, Dep. of Thomas O. Motschman, Jr., at p. 50, ll. 1-23 (while generally wave heights and winds in the Gulf of Mexico are the same within a mile and a half, it can pour down rain on one platform and be bright and "sunshiny" at another a mile and a half away); Dep. of Rogers, Ex. 9 at 237-40 (neither Torres nor Rogers thought the weather conditions made it unsafe to work on the 969 platform on

the day of the incident).

More to the point, Plaintiffs cannot show with clear and convincing evidence that WGPS/Hodges was consciously indifferent since Torres was swept out to sea by a large rogue wave, from a position that Torres chose to work at, when Torres was not wearing an available life jacket required by both company safety policy and posted signage warning of the requirement, and because Torres failed to exercise the stop work authority that he had been given by WGPS.  Clearly there is no evidence that WGPS "did nothing to protect [Torres from any risk of drowning.]" *Diamond Shamrock Refining Co., LP v. Hall*, 168 S.W. 3d 164 (Tex. 2005)("Viewing the record in the light most favorable to the plaintiff, there is no clear and convincing evidence that Diamond Shamrock knew of the risk of the compressor explosion that resulted in Hall's death and yet did not care."). WGPS insists that the exhibits relied upon by Plaintiffs do not constitute clear and convincing evidence of gross negligence or malice entitling Plaintiffs to recover anything from WGPS.  Not only is there no evidence of malice that meets the statutory definition, Tex. Civ. Prac. & Rem. Code § 41.001(7), i.e., that WGPS had a "specific intent . . . to cause substantial injury or harm" to Torres, but the facts show the opposite:  Torres was well-liked, he was promoted through the ranks to operator, and WGPS had policies and equipment in place to avoid this accident if Torres had followed the policies or used an available life

-40-

preserver.

*Court's Decision*

Review of a motion for summary judgment is different from review of a jury's verdict at trial.  As noted, to avoid summary judgment, a nonmovant need only show that a genuine issue of material fact on the essential elements of his cause of action on which he bears the burden of proof at trial, such that a reasonable jury might return a verdict in his favor, i.e., "there are . . . genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."  *Anderson*, 477 U.S. at 249, 250.  On a summary judgment review, all evidence and reasonable inferences must be viewed in a light most favorable to the nonmovant.  Unlike a jury hearing evidence at trial, the court on summary judgment may not make credibility determinations or weigh competing evidence to determine the truth of the matter, but may only determine whether there is a genuine issue of material fact for trial.  *Anderson*, 477 U.S. at 249, 255.  *See also International Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1263 (5th Cir. 1991)("In resolving the motion, the court may not undertake to evaluate the credibility of the witnesses, weigh the evidence or resolve factual disputes; so long as the evidence in the record is such that a reasonable jury drawing all inferences in favor of the nonmoving party could arrive at a verdict in that party's favor, the court must deny the

-41-

motion."(*citing Anderson*, 477 U.S. at 253-54).   Rule 56 authorizes
summary judgment "'only where the moving party is entitled to
judgment as a matter of law, where it is quite clear what the truth
is .. . (and where) no genuine issue remains for trial . . . (for)
the purpose of the rule is not to cut litigants off from their
right of trial by jury if they really have issues to try.'"  *Poller
v. Columbia Broadcasting System*, *Inc.*, 368 U.S. 464, 467 (1962),
*quoting Sartor v. Arkansas Natural Gas Corp.*, 321 U.S. 620, 627
(1944).   If the evidence on key, material facts is reasonably
disputed, the claim is not amenable to summary judgment and the
defendant's motion must be denied.  Of course conclusory statements
unsupported by evidence or the mere existence of a scintilla of
evidence in support of the nonmovant's position is not sufficient;
there must be probative evidence on which a jury could reasonably
find for the nonmovant.  *Anderson*, 477 U.S. at 248, 252.

As noted, with a cause of action for gross negligence,
Plaintiffs bear the burden of proving their claim under the
heightened standard of clear and convincing evidence, rather than
the usual preponderance of the evidence.  The clear and convincing
evidentiary standard, on the surface, might appear contrary to the
boilerplate general summary judgment standard that evidence need
only raise an genuine issue of material fact for trial.   The
Supreme Court, however, addressed the effect of such a heightened
standard in a criminal trial (beyond a reasonable doubt) and on

summary judgment in the context of the First Amendment in a civil libel case (actual malice) in *Anderson*, 477 U.S. at 252-57, and determined that the higher evidentiary standard must be taken into account. "[T]he determination of whether a given factual dispute requires submission to a jury must be guided by the evidentiary standards that apply to the case." *Id.* at 255. It opined,

> [I]n ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden. . . . The question here is whether a jury could reasonably find *either* that the plaintiff proved his case by the quality and quantity of evidence required by the governing law *or* that he did not. Whether a jury could reasonably find for either party, however, cannot be defined except by the criteria governing what evidence would enable the jury to find for either the plaintiff or the defendant. It makes no sense to say that a jury could reasonably find for either party without some benchmark as to what standards govern its deliberations and within what boundaries its ultimate decision must fall, and these standards and boundaries are in fact provided by the applicable evidentiary standards.

*Id.* "Thus, where the factual dispute concerns actual malice, . . . the appropriate summary judgment evidence question will be whether the evidence in the record could support a reasonable jury finding whether the plaintiff has shown actual malice by clear and convincing evidence or the plaintiff has not." *Id.* at 255-56. While a defendant moving for summary judgment may initially show there is no genuine issue of material fact, the plaintiff may not rest on mere allegations or denials, but must offer significant probative evidence to support his contentions and defeat a properly supported motion for summary judgment by showing that a jury might

return a verdict in his favor. *Id.* at 256-57. The judge must then be guided by the "clear and convincing" evidentiary stand in deciding whether the evidence presented is such that a reasonable jury might find knowledge of the danger and conscious indifference with convincing clarity. *Id.* at 257. *See also Phillips Oil Co. v. OKC Corp.*, 812 F.2d 265, 275 (5th Cir. 1987), *cert. denied*, 812 F.2d 265 (1987).

On summary judgment the judge should "bear in mind the actual quantum and quality of proof necessary to support liability," here clear and convincing evidence of gross negligence to allow a rational finder of fact to find that WGPS was grossly negligent. *Anderson*, 477 U.S. at 254 ("Thus, in ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden."). While opining that taking into account the clear-and-convincing standard of proof in ruling on summary judgment motions "does not denigrate the role of the jury," the high court reiterated that the trial court still may not make credibility determinations, nor weigh the evidence, nor draw legitimate inferences from the facts other than in favor of the nonmovant. *Id.* at 255.

"A corporation may be liable in punitive damages for gross negligence only if the corporation itself commits gross negligence." *Ellender*, 968 S.W. 2d at 921. A corporation can only act through "agents of some character" or vice-principal. *Hammerly*

-44-

*Oaks, Inc. v. Edwards*, 958 S.W. 2d 387, 389 (Tex. 1997); *Ellender*, 968 S.W. 2d at 921.  "A corporation is liable for punitive damages if it authorizes or ratifies an agent's gross negligence or if it is grossly negligent in hiring an unfit agent." *Ellender*, 968 S.W. 2d at 921.  It may also be liable if it commits gross negligence through the actions or inactions of a vice principal, i.e., a corporate officer, one who has the authority to employ, direct, and discharge the master's servants, one engaged in the performance of nondelegable duties of the master, or one to whom the master has confided the management of the whole or a department or division of the business.  *Id.* at 923.  Plaintiffs have alleged that Hodges is a supervisor, was the PIC that day, supervised Torres, and instructed him to repair or replace the ESD and where to work.

The evidence makes clear, despite Plaintiffs' attempt to distort it, that if there is only one operator on a satellite platform [here, the 969], as was the case with Torres on the day of his fatal accident, that one operator is the PIC for that platform. Moreover, the overwhelming deposition testimony shows that WGPS/Hodges was not actually aware of the peril on platform 969 that day, and indeed neither were those who accompanied Torres to the 969 platform and worked on that platform that day.  Moreover, there is substantial evidence of WGPS' serious concern about, efforts to protect, and training regarding the safety of its employees.  Plaintiffs have not presented clear and convincing

-45-

evidence of the contrary.

After reviewing the evidence the Court concludes that Plaintiffs have failed to meet their burden to present sufficient evidence such that a reasonable jury might find WGPS'/Hodges' had actual subjective knowledge of the extreme risk and danger on board the 969 platform, three miles away from Hodges' location, the day of the accident, despite all the safety precautions in place on the platform; or that the experienced operator/PIC Torres, with stop work authority, would miscalculate the danger, not comply with company safety standards, nor use a readily available life vest, despite the clear sign requiring it, nor exercise his stop work authority. Nor have Plaintiffs shown clear and convincing evidence that WGPS even knew of, no less was consciously indifferent to, Torres' safety in light of the measures it had taken to prevent such accidents on platform 969 and its history of no such fatalities. Accordingly, the Court concludes that WGPS' motion for partial summary judgment should be granted.

Thus WGPS' motion to bifurcate the trial (#208)[16] and motion in limine (#22) are MOOT.

## 5.  Peregrine's Motion for Summary Judgment (#125)

---

[16] WGPS moved for a bifurcated trial of separate issues of other Defendants' liability under OCSLA and compensatory damages, if any, versus the claim against WGPS as Torres' employer, for exemplary or punitive damages under the § 408.001(b) of the Texas Workers' Compensation Act, Texas Labor Code.  Since the latter will no longer be pending in this action, the motion is moot.

The Second Amended Complaint, ¶ 5.03, charges Peregrine with the following acts of negligence or gross negligence: (1) exposing Torres to an unnecessary risk of serious injury and death; (2) failing to install and provide appropriate safety devices and mechanisms; (3) failing to provide adequate notices, warnings, cautions, advisories and instructions to the occupiers of the platform; (4) failing to reasonably warn the purchasers of the dangerous characteristics and propensities of the subject platform; (5) failing to furnish Torres with fall protection designed to reduce the risk of death or serious personal injuries; (6) failing to properly service the platform and provide safety equipment such as fall protection on the platform; (7) failing to properly maintain the platform with proper safety chains and fall protection; (8) failing to warn of the dangerous propensity of being swept off of the rig; (9) requiring Torres to engage in an inherently dangerous activity on the day of the accident; (10) failing to have safety rules and/or procedures in effect for the work on the platform; (11) failing to have a JSA performed before Torres began his work on the ESD; (12) ordering Torres to do work in an area which was unsafe and not implementing or having any man-overboard plan; (13) having no safety rules in effect at the time of the incident; (14) allowing pressure from Torres' supervisors to compel Hodges to order Torres to perform work in weather conditions that made the work inherently dangerous; (15) failing to have life

rings equipment with ropes to pull out persons in the water once they were overthrown, as testified to by Plaintiff's expert; (16) failing to properly train Torres in adverse weather conditions; (17) failure of Hodges to exercise his stop work authority to prevent the job from going forward; (18) Cal Rogers' failure to exercise his stop work authority; (19) failure of PIC Hodges to follow any relevant guideline, such as providing fall protection or a buoy system while working in cold weather, performing a JSA, or exercising his stop work authority until the conditions were better; (20) failure of Defendants to perform any work without a signed contract in place allocating the risk inherent in this type of work/job; (21) Defendants' failure to have a rescue plan in case someone entered the water in such conditions; (22) failing to have properly trained safety engineers to implement a plan to place the ESD in a location away from the water; (23) failing to engineer a safety system which would withstand the expected high sea conditions in the Gulf of Mexico and to implement the same so that the ESD would be in a location safe from washout and one that did not present a danger to persons working on the ESD; (24) negligently exercising a right of control placed on it by law; (25) having actual knowledge of the location of the work and the sea conditions and negligently failing to implement any safety plan or rules relating to the work; and (26) having actual knowledge of the sea conditions and the ESD's proneness to washout and failing to

move it to a higher position before Torres worked on it.

After carefully reviewing the briefing on Peregrine's motion and all the summary judgment evidence, the Court concurs with Peregrine that Peregrine is entitled to summary judgment on the claims against it. Rather than recite all of the arguments made, the Court summarizes the controlling law and the admissible and competent evidence that supports Peregrine's motion and demonstrates that Plaintiffs have failed to raise a genuine issue of material fact for trial.

Plaintiffs sue Peregrine for negligence and gross negligence. The applicable Texas law, Chapter 95,[17] § 95.003 of the Texas Civil Practice & Remedies Code, governs a property owner's liability to independent contractors like WGPS and its employees/subcontractors and provides the exclusive remedy for claims of negligence against a property owner by an independent contractor[18]:

> A property owner is not liable for personal injury, death, or property damage to a contractor, subcontractor or an employee of a contractor or subcontractor who

---

[17] Chapter 95 specified that it "applies only to a claim" (1) against a property owner . . . for personal injury . . and (2) that arises from the condition or use of an improvement to real property where the contractor or subcontractor constructs, repairs, renovates, or modifies the improvement.  § 95.002(1)-(2).

[18] See, e.g., Franks v. Chevron Corp., Civ. No. 3:06-cv-506, 2007 WL 2330296, *5 (S.D. Tex. Aug. 13, 2007); Francis v. Coastal Oil and Gas Corp., 130 S.W. 3d 76, 88 (Tex. App.--Houston [1st Dist.] 2003, no pet.)(holding that when Chapter 95 applies, it is the plaintiff's exclusive remedy and precludes common law negligence liability); Francis v. Coastal Oil and Gas Corp., 130 S.W. 3d 76, 88 (Tex. App.--Houston [1st Dist.] 2003, no pet.).

constructs, repairs, renovates, or modifies an improvement to real property, including personal injury, death, or property damage arising from the failure to provide a safe workplace unless:

(1) The property owner exercises or retains some control over the manner in which the work is performed, other than the right to start or stop or to inspect progress or receive reports; and

(2) the property owner had actual knowledge of the danger or condition resulting in the personal injury, death or property damage and failed to adequately warn.

Both prongs, (1) some control over the manner of the independent contractor's work[19] and (2) actual knowledge of the condition or danger and failure to adequately warn, must be met before liability will be imposed on the property owner. *Kelly v. LIN Television*, 27 S.W. 3d 564, 567 (Tex. App.--Eastland 2000, pet. denied).

Chapter 95 of the Texas Civil Practices and Remedies Code does not conflict with federal law. *See Arsement*, 400 F.3d 238 (upholding application of Chapter 95 and OCSLA to a negligence claim by an injured offshore platform worker); *Credeur v. MJ Oil, Inc.*, 123 Fed. Appx. 585, 588 (5th Cir. 2004)(Because Defendants exerted some control over Credeur's work but lacked actual

---

[19] The test for distinguishing between an employee and an independent contractor is whether the employer has the right to control the progress, details and methods, of operations of the work; the employer must control not merely the end to be accomplished, but in addition the means and details of reaching that end, e.g., when and where to begin and stop work, the regularity of hours, the amount of time spent on particular aspects of the work, the tools and appliances used to perform the work, and the physical method or manner of accomplishing that final result. *Thompson v. Travelers Indem. Co. of R.I.*, 789 S.W. 2d 277, 278-79 (Tex. 1990).

knowledge of the danger or condition resulting in Credeur's injuries and because Chapter 95 is the sole basis for imposing liability, they are protected from liability.).

Peregrine bears the burden of showing that Chapter 95 applies to the Plaintiff's claim. *Rueda v. Paschal*, 178 S.W. 3d 107, 111 (Tex. App.--Houston [1st Dist.] 2005, no pet.); *Barker v. Hercules Offshore, Inc.*, Civ. A. No. H-10-0898, 2012 WL 434457, *3 (S.D. Tex. Feb. 9, 2012), *citing Sinegal v. Ryan Marine Services*, 712 F. Supp. 2d 598, 601 (S.D. Tex. 2005). Peregrine points out that entities operating offshore oil and gas rigs are "property owners" under Chapter 95 as a matter of law. *See, e.g., Arsement*, 400 F.3d at 245 (applying Texas law); *Nagle v. GOM Shelf, LLC*, No. Civ. A. V-03-103, 2005 WL 1515439, *4 (S.D. Tex. June 24, 2005)(same). There is also undisputed evidence in the record that Peregrine owned the 975 and 969 platforms since October 2007. *See, e.g.,* Madeley Dep., #125, Ex. I at 313; see also discussion of ownership *supra* regarding Shell's motion for summary judgment. Peregrine used the 969 Platform in its commercial or business purposes of producing and marketing oil and gas. #125, Report, Ex. A at pp. 3-4. Furthermore Peregrine is a "property owner" within the meaning of § 95.002(2) of Chapter 95 because it had a mineral interest in the land and was entitled to a reasonable use of the surface estate. *Francis v. Coastal Oil & Gas Corp.*, 130 S.W. 3d 76, 84 (Tex. App.--Houston [1st Dist.] 2003)("Well settled law holds that

a mineral lease conveys a fee simple determinable interest in real property."), *citing Jupiter Oil o. v. Snow*, 819 S.W. 2d 466, 468 (Tex. 1991)("The common oil and gas lease is a fee simple determinable."); *Barker v. Hercules Offshore, Inc.*, Civ. A. No. H-10-0898, 2012 WL 434457, *3 (S.D. Tex. Feb. 9, 2012).

Under § 95.002, Chapter 95 applies to a claim of negligence against a property owner based on a failure to provide a safe workplace due to a "condition or use of an improvement to real property" where the contractor or subcontractor "constructs, repairs, renovates or modifies the improvement"; both conditions must be satisfied. *Francis*, 130 S.W. 3d at 84. Mineral wells like the 969 platform are "improvements" to real property as a matter of law. *Id.* at 85, *citing Fox v. Thoreson*, 398 S.W. 2d 88, 89 (Tex. 1966), and *Hunt v. HNG Oil Co.*, 791 S.W. 2d 191, 194 (Tex. App.--Corpus Christi 1990, writ denied). Torres, an employee of independent contractor WGPS (§ 92.002(1)), was making a repair on the ESD station on the platform at the time of the accident (§ 95.002(2)). Activities facilitating a well's performance qualify as construction, renovation or modification under Chapter 95. *Credeur*, 123 Fed. Appx. at 587, *citing Francis,* 130 S.W. 3d at 83; *Nagle*, 2005 WL 1515439, *5; Plaintiffs' expert's (Jack Madeley's) Dep., #125, Ex. I at p. 168, l. 24-p. 169, l. 5 (Torres was instructed "to repair the ESD that was malfunctioning"), p. 313, ll. 22-24 (agreeing that Torres was making a repair to the platform

when he was injured).   Madeley determined that Torres' death
resulted from a combination of weather and the location of the
repairs where the weather conditions could wash Torres overboard,
a dangerous condition (sea conditions and proximity to sea
conditions) of the real property.   Madeley Dep., #125, Ex. I at p.
295, l, 20-p. 296, l. 7.   *Fisher v. Lee & Chang P'ship*, 16 S.W. 3d
198, 201 (Tex. App.--Houston [1st Dist.] 2000, pet. denied)(Chapter
95 applies where an employee of an independent contractor is
injured as a result of some condition of real property related to
actual work he was hired to perform); *Sinegal*, 712 F. Supp. 2d at
602 (Chapter 95 even applies where the defective condition or
activity giving rise to the injury was not the direct object of the
independent contractor's work).[20]

_____

[20] Plaintiffs rely on *Hernandez v. Brinker Intern., Inc.*, 285
S.W. 3d 152, 157-58 (Tex. App.--Houston [14th Dist.] 2009), to argue
that Chapter 95 does not apply to the independent contractor's
employee's claim against the property owner if he was injured by
something other than the improvement on which he was working.
Plaintiffs emphasize that it is undisputed that Torres was not
injured by the ESD, but by the condition of the platform.   Section
95.002(2) states that Chapter 95 "applies only to a claim . . .
that arises from the condition or use of an improvement to real
property where the contractor or subcontractor constructs, repairs,
renovates or modifies the improvement."   Section 95.003 provides
that a property owner is not liable for "injury . . . arising from
the failure to provide a safe workplace."   In *Hernandez*, the
contractor was hired to replace a compressor motor in an air
conditioner on the roof of a restaurant.   285 S.W. 3d at 153-54.
When he was removing the compressor, the roof collapsed and he fell
through the opening, injuring himself.   In a plurality opinion
*Hernandez*, Judge Brown concluded that Chapter 95 did not apply
"when the improvement the condition or use of which gives rise to
the injury claim is not the same improvement the contractor was at
the premise to address at the time of injury."   *Id*. at 157-58.

Because Peregrine has shown that Chapter 95 applies to Plaintiffs' claims against it, the burden shifts and Plaintiffs must prove the two elements of § 95.003, of control and actual knowledge, in the first and second prongs, respectively. *Id.,*

---

Judge Anderson concurred only on the ground that the defendant failed to establish that it was a property owner. *Id.* at 164.  The third member of the panel, Judge Yates, dissented, disagreed with Judge Brown's analysis and concluded that the statute was ambiguous as to whether the "improvement contemplated is the overall structure, part of the structure, or both," and found that the plaintiff's injury was adequately related to the work for which he was hired. *Id.* at 165–66.

*Hernandez* has been widely rejected. *See Gorman v. Ngo H. Meng*, 335 S.W. 3d 797, 805 (Tex. App.--Dallas 2011)(*Hernandez* "appears to be a departure from the existing case law of other intermediate courts of appeals"), *citing inter alia Fisher v. Lee & Chang P'ship*, 16 S.W. 3d 198, 201 (Tex. App.--Houston [1st Dist.] 2000, pet. denied)("The statute does not require that the defective condition be the object of the contractor's work."); *Painter v. Momentum Energy Corp.*, 271 S.W. 3d 388, 398 (Tex. App.--El Paso 2008, pet. denied)("Courts have held that chapter 95 applies, despite the fact that the object causing the injury is not itself an improvement, where the injury arises from work being done on an improvement."); *Phillips v. Dow Chem. Co.*, 186 S.W. 3d 121, 132 (Tex. App.--Houston [1st Dist.] 2005, no pet.); *Francis v. Coastal Oil & Gas Corp.*, 130 S.W. 3d 76, 83 ("The 'failure to provide a safe workplace' means that the injuries must relate to work being done by the injured party, but the injury-producing defect need not be the object of the injured party's work."). *See also Covarrubias v. Diamond Shamrock Refining Co., L.P.* ___ S.W. 3d ___, No. 04-11-00289-CV, 2012 WL 12116, *3 (Tex. App.--San Antonio Jan. 4, 2012)(following *Fisher* and *Phillips*); *Sinegal*, 712 F. Supp. 2d at 602 (Chapter 95 even applies where the defective condition or activity giving rise to the injury was not the direct object of the independent contractor's work).  The Fifth Circuit, in *Spears v. Crown Central Petroleum Corp.*, 133 Fed. Appx. 129, 130-31 (5th Cir. 2005), concluded in the diversity case before it that because the Texas Supreme Court had not decided the issue, it should follow the path of the majority of intermediate courts, in particular of *Fisher*, where the court, relying on the statute's legislative history, ruled that the plaintiff's injury was due to the failure of the property owner to provide a safe workplace and is covered by Chapter 95.  This Court does the same in the instant action.

*citing Gorman v. Ngo H. Meng*, 335 S.W. 3d 797, 802-03 (Tex. App.--Dallas 2011).

The requisite control can be contractual or actual. Tex. Civ. Prac. & Rem. Code § 95.003;; *Lee Lewis Const., Inc.*, 70 S.W. 3d at 783; *Union Carbide Corp. v. Smith*, 313 S.W. 3d 370, 375 (Tex. App.--Houston [1st Dist.] 2010, rev. denied), *citing Vanderbeek v. San Jacinto Methodist Hosp.*, 246 S.W. 3d 346, 352 (Tex. App.--Houston [14th Dist.] 2008, no pet.), *citing Dow Chem. v. Bright*, 89 S.W. 3d 602, 606 (Tex. 2002). As opined in *Hernandez v. Hammond Homes, Ltd.*, 345 S.W. 3d 150, 153-54 (Tex. App.--Dallas 2011, rev. denied),

> A party can prove a right to control in two ways: first, by evidence of a contractual agreement that explicitly assigns the employer a right to control; and second, in the absence of a contractual agreement, by evidence that the employer actually exercised control over the manner in which the independent contractor performed its work. *Dow Chem. Co.*, 89 S.W. 3d at 606; *Coastal Marine Serv.*, 988 S.W. 2d at 226. If a written contract assigns the right to control to the employer, then the plaintiff need not prove an actual exercise of control to establish a duty. *See Pollard v. Mo. Pac. R.R. Co.*, 759 S.W. 2d 670, 670 (Tex. 1988)(per curiam). However, if the contract does not explicitly assign control over the manner of work to the employer, then the plaintiff must present evidence of the actual exercise of control by the employer. *See Dow Chem. Co.*, 89 S.W. 3d at 606 . . .

"A contract may impose control upon a part thereby creating a duty of care." *Dow Chemical Co.*, 89 S.W. 3d at 606. "For a general contractor to be liable for its independent contractor's acts, it must have the right to control the means, methods, or details of the independent contractor's work." *Id., quoting Elliott-Williams*

*Co. v. Diaz*, 9 S.W. 3d 801, 804 (Tex. 1999).  The question whether a contract gives the right of control is usually a question of law for the court, while the issue of actual control is usually a question of fact for the jury.  *Lee Lewis Const., Inc.*, 70 S.W. 3d at 783.  The summary judgment evidence demonstrates that WGPS was an independent contractor both by contract and by law.

The uncontroverted facts demonstrate that Peregrine hired WGPS as an independent contractor to perform work on Platform 969.  #125, Report, Ex. A at pp. 2 and 6; *Id.*, October 2007 Master Service Agreement ("MSA") between Peregrine and Wood Group Pressure Control, L.P., Ex. B.[21]  Torres was an employee of WGPS at the time

_____

[21] Plaintiffs argue that there was no written agreement between Peregrine and WGPS when Torres died on January 19, 2008, that the MSA was entered into in February 2008, a month after that death, when Wood Pressure Group was not Torres' employer, and backdated (made retroactive to) October 2007.  WGPS, Torres' employer, was added for the first time by the Amended MSA (Exhibit C) on January 20, 2009, over a year after Torres' death.  They argue that without a written agreement, one could only guess at the relationship between Peregrine and WGPS.  They charge that the contract is a sham and a subterfuge which courts will reject as a basis to establish an independent contractor defense.  *See, e.g., Exxon Corp v. Perez*, 842 S.W. 2d 629, 630 (Tex. 1992)("This court has held that a contract will not prevent the existence of a master-servant relationship where the contract is 'a mere sham or cloak designed to conceal the true legal relationship between the parties.");  *Texas Workers' Compensation Ins. Facility v. Personnel Services, Inc.*, 895 S.W. 2d 889, 893 (Tex. App.--Austin 1005, no pet.)("A contract that is a mere sham or cloak designed to conceal the true legal relationship between the parties will not control employment status.").  They maintain that the contract here is not determinative of the relationship, so the issue of right of control is a question for the jury.  *Id.*  They insist Plaintiffs have no proof that WGPS is an independent contractor or subcontractor and that it could just as easily be an agent, borrowed servant, temporary employee, joint venturer or co-owner.

of the incident.  Peregrine insists that pursuant to the contract
between the parties, it did not have any control over WGPS.  The
MSA contract (#125, Ex. B at pp. 2-3, ¶ 7) clearly and
unambiguously stated that independent contractor Wood Group
Pressure Control, L.P. was not in any way under the control of
Peregrine:

> In the performance of the services hereunder, Contractor
> [WGPS] agrees that it shall act as and be an independent
> Contractor free and clear of any dominion or control by
> Company [Peregrine] in the manner in which said services
> are to be performed and that neither Contractor nor any
> entity in the Contractor Group are servants, agents or
> employees of Company, and as such Contractor:
>
> a.  acts as the employer of any employee of the
> Contractor by paying wages, directing activities,
> performing other similar functions characteristic of an
> employer-employee relationship;

---

In response Peregrine points out that Texas courts follow the
generally accepted principle of contract interpretation that all
writings that pertain to the same transaction will be considered
together, even if they were executed at different times and do not
expressly refer to one another.  *D Design Holdings, L.P. v. MMP
Corp.*, No. 05-10-00032-CV, 2011 WL 989060, *4 (Tex. App.--Dallas
Mar. 22, 2011), *citing DeWitt Cnty. Elec. Co-op., Inc. v. Parks*, 1
S.W. 3d 96, 102 (Tex. 1999); *Tribble & Stephens Co. v. RGM
Constructors, L.P.*, 154 S.W. 3d 639, 663 (Tex. App.--Houston [14th
Dist.] 2004, pet. denied)(separate agreements may be incorporated
by reference into a signed contract and the language used to
incorporate a document is not important provided the signed
document plainly refers to the incorporated document).  Moreover,
Plaintiffs have not shown that the contract was a sham and a
subterfuge nor that Peregrine or WGPS did not intend for an
independent contractor relationship to be established by the MSA;
the language of the contract clearly and unambiguously sets out
such a relationship.  In addition, Peregrine insists that evidence
submitted by Peregrine, including from Plaintiffs' own expert,
conclusively establishes that Peregrine exercised no control over
any person on the 969 platform on the day of the incident.

b.  is free to determine the manner in which the work or service is performed, including the hours of labor and the method of payment to any employee;

c.  is required to furnish or have his employees, if any, furnish necessary tools, supplies, or material to perform the work or service;

d.  possesses the skills required for the specific work or service;

e.  represents that it has adequate equipment in good working order and fully trained personnel capable of efficiently operating such equipment and performing the related services in a safe, proper and workmanlike manner for Company;

f.  agrees to file all required tax reports and pay all taxes when due;

g.  agrees that neither Contractor nor Contractor's employees agents or subcontractors will be covered by Company's Workers' Compensation;

h.  agrees that Contractor and Company will sign the current TWCC form establishing an Independent Contractor relationship under the Texas Workers' Compensation Act, if work is performed in Texas or under Texas law and Contractor does not purchase Texas Workers' Compensation Coverage; and

I.  agrees that as allowed by the Louisiana Workers' Compensation Act, Company shall be considered the statutory employer of all employees of the Contractor, Contractor's subcontractors or agents, provided, however, services performed by Contractor, Contractor's subcontractors or agents for Company are an integral part of or essential to Company's ability to perform its operations as an oil and gas operator.

The Amended MSA between Peregrine and WGPS (Ex. C, January 2009 contract agreeing to ratify, adopt and confirm terms and conditions of the October 1, 2007 MSA) states that the parties now desire WGPS to become a signatory to the October 1, 2007 MSA and that WGPS

agrees that all work performed as of October 1, 2007 is pursuant to its terms as if WGPS were an original signatory to the MSA. Plaintiffs' expert even testified that from the time Peregrine took over ownership of the platform from Shell up until the date of the accident, nothing changed in the scope of work or payment of employees and independent contractors other than the name of the owner of the platform.  Dep. of Madeley, Ex. E, at p. 313, ll. 3-24.  Therefore all employees working on the 969 platform were under the direct control of Wood Group, not of Peregrine.

Peregrine concedes that the MSA contract between Peregrine and Wood Group Pressure Control, L.P., was signed after the incident, but argues that it was made enforceable to a date prior to the incident (October 1, 2007) by agreement of the parties (#125, Exhibits B (MSA) and C).  The Court notes Defendants have cited a single Texas court case that has opined, without ciitng authority, "We see no reason why a contract may not be made retroactive where the parties choose to do so.  No case has been cited to us that is precisely in point." *Gulf Oil Corp. v. Spence & Howe Const. Co.*, 356 S.W. 2d 382, 386 (Tex. Civ. App.--Houston 1962), *aff'd*, 365 S.W. 2d 631 (Tex. 1963)(*cited for that proposition, ALCOA v. Hydrochem Indus. Services, Inc.*,No. 13-02-00531-CV, 2005 WL 608232, *4 (Tex. App.--Corpus Christi Mar. 17, 2005)), *overruled in part on other grounds*, *Ethyl Corp. v. Daniel Constr. Co.*, 725 S.W. 2d 705, 708 (Tex. 1987).  Nevertheless that principle has been followed

where the agreement is clear and unambiguous that the parties intended an agreement to apply retroactively. *See, e.g., Gulf States Airgas, Inc. v. American Marine Const., Inc.*, Civ. A. No. 98-0821, 1999 WL 76425, *1 8 n.9 (E.D. La. 1999)(no *per se* limitation on right of parties to have a contract apply retroactively; where parties' agreement plainly shows they intended the agreement to apply retroactively, it should be enforced), *citing Bowen Engineering v. Estate of Reeve*, 799 F. Supp. 467, 486 (D.N.J. 1992)(applying New Jersey law), *aff'd*, 19 F.3d 642 (3d Cir. 1994)(Table); *Martinez v. Barasch*, No. 01CIV2289(MBM), 2006 WL 435727, *5 (S.D.N.Y. Feb. 22, 2006)(applying New York law); *Anaconda Co. v. Chapman-Dyer Steel Mfg, Co.*, 117 Ariz. 254, 257, 571 P.2d 1050, 1053 (App. 1977), *discussed in Shiloh Custom Homes, Inc. v. Don Miller Drywall, Inc.*, No. 1 CA-CV 07-0677, 2007 WL 4328991 (Ariz. App. Div. 1 Oct. 31, 2007). Moreover, under standard contract principles, with the court's primary concern being to ascertain the true intentions of the parties as expressed in a contract, the court gives contract terms their plain and ordinary meaning unless the contract indicates that the parties intended a different meaning. *Dynegy Midstream Servs., Ltd. P'ship v. Apache Corp.*, 294 S.W. 3d 164, 168 (Tex. 2009). Thus the Court finds here that the intent of the parties to make the MSA contract retroactive to October 2007 (the date when Peregrine took over ownership of the platform from Shell) is clear and unambiguous, as

-60-

is the intent in the Amended MSA (Ex. C) to make WGPS a signatory retroactive to 2007.

Plaintiffs argue that a statement in the Amended MSA, "Effective as of the effective date of the Agreement, Contractor agrees to perform work, as directed by [Peregrine], and hereby ratifies, adopts, and confirms the terms and conditions of the Agreement, as if it was an original signatory to the Agreement," should be construed to mean that Peregrine agreed to control the work of WGPS. The Court agrees with Peregrine that, in context of the  agreement, the obvious intent of which was to make the MSA retroactive, such a broad reading is not only unwarranted since the agreement expressly reaffirmed the terms of the MSA, including ¶ 7, but is totally unsupported by any evidence demonstrating that Peregrine was actually exercising control over the manner in which the independent contractor's work was performed.[22]   Rather the statement means that Peregrine agrees to provide a job for WGPS.

Peregrine additionally insists that the retroactivity factor does not change the analysis of liability under Chapter 95. WGPS was an independent contractor as a matter of law because (1) its purpose and work on Platform 969 was independent and distinct from

---

[22] See #125, Madeley Dep., Ex. I at p. 310, ll. 9-12; p. 311, ll. 13-16; p. 314, ll. 7-13.  Rogers Dep., Ex. E at p. 192, ll. 4-14; p. 199, ll. 16-18; p. 315, ll. 16-2 and l. 24.  Motschman Dep., Ex. F, at p. 115, l. 20-p. 116, l. 1 and ll. 6-8 and 16-25; p. 117, ll. 6-10; p. 195, ll. 6-8; p. 222, ll. 7-21; p. 225, ll. 19-25. Self Dep., Ex. G at p. 213, ll. 18-23,

Peregrine's purpose[23]; (2) it agreed to furnish the tools and supplies necessary and material to perform its duties on that platform[24]; (3) Peregrine did not exercise any right to control that work; and (4) WGPS was responsible for paying its employees for the work performed on platform 969. *Texas A & M Univ. v. Bishop*, 156 S.W. 3d 580, 584-85 (Tex. 2005)(holding that the right to control is measured by considering (1) the independent nature of the worker's business, (2) the worker's obligation to furnish necessary tools, supplies, and materials to perform the job, (3) the worker's right to control the progress of the work, except as to the final results, (4) the time for which the worker is employed, and (5) the method of payment, whether by unit of time or by the job. MSA, Ex. B, at ¶¶ 7, 17-24. Moreover there is no evidence Peregrine exercised or retained control over Torres.[25]

---

[23] WGPS was hired by Peregrine to maintain the unmanned platform. Ex. A at 2, 4, 6.

[24] Peregrine correctly points out a number of instances where Plaintiffs have misrepresented or distorted the testimony of various individuals, especially regarding matters including fall protection equipment, tools, etc. The MSA, Ex, B at ¶7 reflects that WGPS was to furnish necessary tools and supplies for performance of maintenance on Platform 969.

[25] The Texas Supreme Court has stated,

[W]hen the dangerous condition [on the premises] arises as a result of the independent contractor's work activity--the premises owner normally owes no duty to the independent contractor's employees because an owner generally has no duty to ensure that an independent contractor performs its work in a safe manner. However, a premises owner may be liable when the owner retains the

Under the second prong for owner liability under § 95.003, Peregrine must "have the right to control the means, methods or details of the independent contractor's work to the extent that the independent contractor is not entirely free to do the work his own way." *Ellwood Texas Forge Corp. v. Jones*, 214 S.W. 3d 693, 700 (Tex. App.--Houston [14th Dist.] 2007). The right to control must be over the "operative detail of the contractor's work." *Id*. The right to control must also relate to the injury caused by the owner's negligence. *Id*. It must be more than the right to order the work to stop and start or to inspect progress or receive reports or recommend a safe manner for the independent contractor's employees to perform the work. *Id. See also Hoechst-Celanese Corp. v. Mendez*, 967 S.W. 2d 354, 357-58 (Tex. 1998)(*per curiam*)(an employer's requirement that an independent contractor observe workplace safety guidelines does not impose on the employer an unqualified duty of care to ensure that the independent contractor's employees did nothing unsafe, but only a narrow duty

---

right of supervisory control over work on the premises. In determining whether an owner has retained this right to control, the standard is narrow. The right to control must be more than a general right to order work to stop and start, or to inspect progress. The supervisory control must relate to the activity that actually caused the injury, and grant the owner at least the power to direct the order in which work is to be done or the power to forbid it being done in an unsafe manner.

*Coastal Marine Serv*., 988 S.W. 2d at 225-26 (superseded by passage of Chapter 95).

to make sure that any safety requirements and procedures it promulgated did not unreasonably increase, rather than decrease the probability and severity of the injury.).

Even if the Court had determined that the MSA was not enforceable, there is no evidence that Peregrine had the right to control, retained any control, or actually exercised control over the manner in which Torres went about repairing the ESD.   Even Plaintiff's expert testified that Peregrine did not control any manner in which Torres completed his work on the platform that day of the incident.   Dep. of Madeley, Ex. I at p. 310, ll. 9-21; p. 311, ll. 13-16; p. 314, ll. 7-13.   *See also* Cal Rogers Dep., Ex. E at p. 192, ll. 4-13; p. 199, ll. 16-18; p. 315, ll. 16-20 and 24. Dep. of Thomas Motschman, Peregrine's Liaison, Ex. F at p. 155, l.20-p. 116, l.1; p. 116, ll. 6-8 and 16-25; p. 117, ll. 6-10; p. 222, ll. 7-21; p. 225, ll. 19-25.   Dep. of Clyde Self, WGPS' Compliance Manager, Ex. G, p. 213, ll. 18-23.   Dep. of Terryl Gipson, WGPS' Group Lead Operator, Ex. H at p. 34, ll. 11-12. Peregrine's sign, "PFD's REQUIRED BEYOND THIS POINT," was not the cause of the accident nor did it unreasonably increase the likelihood of serious injury or death.   *See Hoechst-Celanese Corp. v. Mendez*, 967 S.W. 2d at 357-58 (an employer's requirement that an independent contractor observe workplace safety guidelines does not impose on the employer an unqualified duty of care to ensure that the independent contractor's employees did nothing unsafe, but only

a narrow duty to make sure that any safety requirements and procedures it promulgated did not unreasonably increase, rather than decrease the probability and severity of the injury.).

Nor is there any evidence that any Peregrine employees were actually aware that WGPS was working on Peregrine's platform on the day of the accident and that there was a dangerous condition there that resulted in Torres' death and about which Peregrine had a duty to adequately warn. *Chi Energy, Inc. v. Urias*, 156 S.W. 3d 873, 878-79 (Tex.--El Paso 2005, pet. denied). Jack Madeley testified that not only was there no one from Peregrine on Platform 969 at the time of the incident, but there was no one on Platform 975 either. #125, Ex. I at p. 310. He also stated that as far as he knew, Peregrine did not have actual knowledge about which day the work would be done until they received a call that Torres had died. *Id.* at 307. Knowing that an activity is potentially dangerous fails to satisfy the second prong of § 95.003; instead actual knowledge of the dangerous condition is required. *Ellwood*, 214 S.W. 3d at 700; *Phillips v. The Dow Chemical Co.*, 186 S.W. 3d 121, 135 (Tex. App.--Houston [1st Dist.] 2005)(constructive knowledge does not satisfy § 95.003(2)).

In sum, the Court concludes that the summary judgment evidence demonstrates that Peregrine is not liable under the applicable Chapter 95, which bars Plaintiffs' claims against property owner Peregrine.

The First Amended Complaint alternatively charges that Peregrine had a non-delegable duty of care to protect persons like Torres from inherently hazardous and/or dangerous activities and is therefore strictly liable for Plaintiffs' injuries and damages. First, the Court has determined that Chapter 95, § 95.003, of the Texas Civil Practice & Remedies Code, provides the exclusive remedy for claims of negligence against a property owner by an independent contractor  and its employees/subcontractors and that Plaintiffs have failed to meet its requirements to impose liability on Peregrine.  Because it is the exclusive remedy, Plaintiffs' alternative argument that Peregrine had a non-delegable duty of care, breached it, and is strictly liable, fails.

Even if the Court had determined that this remedy was not exclusive, Peregrine shows with its summary judgment evidence, including that of Plaintiffs' own expert, that the work being performed by Torres was not inherently hazardous or dangerous. Madeley Dep., Ex. I, o. 238, ll. 10-14; p. 295, l.20-p. 297, l.25. Plaintiffs have not produced any evidence that Peregrine had a non-delegable duty of care.  No Texas cases have found that offshore work is an inherently dangerous activity.  Peregrine in contrast points to evidence showing that Torres' job the day of the incident did not involve any unusual risk of harm.  Self Dep., Ex. G, p. 222, l. 25-p. 223, l. 18; p. 226, l. 25-p. 227, l.5; Gipson Dep., Ex. h, p. 74, l.20-p. 75, l.8.   Furthermore Texas does not

recognize the duty of care that Plaintiffs assert was violated,[26] nor a non-delegable duty of care owed to non-employees by employers.

Peregrine correctly summarizes Texas law that before the passage of Chapter 95, the general rule was that a general contractor that is an owner or occupier has no duty to prevent harm to an independent contractor when the injury results from an inherent risk in the independent contractor's work. *Ellwood*, 214 S. W.3d at 698, *citing Abalos v. Oil Dev. Co.*, 544 S.W. 2d 627, 631-32 (Tex. 1976)("''[W]here the activity is conducted by, and is under the control of, an independent contractor, and where the danger arises out of the activity staff, the responsibility or duty is that of the independent contractor, and not that of the owner of the premises."[27]), and *Redinger v. Living, Inc*., 689 S.W. 2d 415, 418 (Tex. 1985)(adopting *Restatement (Second) of Torts* § 414 and

---

[26] Peregrine represents that the majority of cases discussing this duty are Louisiana cases analyzing Louisiana Civil Code Art. 2322. *See, e.g., Olsen v. Shell Oil Co.*, 365 So.2d 1285, 1292 (La. 1978)(observing Louisiana jurisprudence interpreting Article 2322 holds that the owner of a building has a non-delegable duty to keep his buildings and its appurtenances in repair so as to avoid unreasonable risk of injury to others, and that he is strictly liable for injuries to others resulting from his failure to perform this duty imposed by law on him). As noted earlier, this action was removed under OCSLA, and the law of the adjacent state where not inconsistent with federal law, in this case the law of Texas, not of Louisiana, applies. Chapter 95 of the Texas Civil Practice & Remedies Code is not inconsistent with federal law.

[27] Here Torres' death arose from his activities and dangers inherent in the nature of the contracted work, so Torres is responsible for working on the platform in a safe manner.

recognizing an exception where the premises owner or general contractor exercises some control over the work of the independent contractor or subcontractor).   A premises owner or general contractor does not owe a duty to ensure that an independent contractor performs work safely.  *Elliott-Williams Co., Inc. v. Diaz*, 9 S.W. 3d 801, 803 (Tex. 1999), *citing Hoechst-Celanese Corp.*, 967 S.W. 2d at 356, *Redinger*, 689 S.W. 2d at 418, and *Abalos*, 544 S.W. 2d at 631.  "The general contractor's duty of care is commensurate with the control it retains over the contractor's work."  *Id.*

Furthermore "a property owner owes a duty to warn only of known dangers."  Tex. Civ. prac. & Rem. Code § 95.003; *Painter v. Momentum Energy Corp.*, 271 S.W. 3d 388, 400-01 (Tex. App.--El Paso 2008, pet.), *citing Rueda*, 178 S.W. 3d at 109-10 (affirming summary judgment in favor of property owner where plaintiff produced no evidence that property owner was aware of alleged defect in ladder), and *LIN*, 27 S.W. 3d at 572 (negligence in failing to inspect tower for stress fractures is not equivalent to actual knowledge under chapter 95).   A property owner has a duty to inspect the premises and warn an independent contractor/invitee of conditions or defects "that are not open and obvious and that the owner knows or should have know exist."[28]  *Coastal Marine Serv.*, 988

---

[28] As opposed to premises defects of the kind that arise through the work activity of the independent contractor.

S.W. 2d at 225.   Thus a property owner has no duty to warn an independent contractor of a potentially dangerous condition if it is "open and obvious" or previously known to the independent contractor.   WGPS and its employees, including Torres, knew of the dangerous weather on the date of the incident and continued despite it.   *Gen. Elec. Co. v. Moritz*, 257 S.W. 3d 211, 218 (Tex. 2008)("While an owner owes a duty to employees of an independent contractor to take reasonable precautions to protect them from hidden dangers on the premises or to warn them thereof, an adequate warning to or full knowledge by the independent contractor of the dangers should and will be held to discharge the landowner's alternative duty to warn the employees.").

Because the Court concludes that Peregrine is entitled to summary judgment that it is shielded by Chapter 95 from liability for Torres' injury, its motion in limine (#218) is moot.

### Court's Orders

Thus in accord with the above discussion, the Court ORDERS that

(1) Shell's motion for summary judgment (#145) is GRANTED and its motion to consider (#296) is MOOT;

(2) Rotorcraft and Good's motion for summary judgment (#134) is GRANTED and their motion to consider (#292) is MOOT;

(3) WGPS's motion to dismiss (#156) is GRANTED and all

Plaintiffs' claims and causes of action against WGPS based on negligence, strict liability and/or joint and several liability, or inherently hazardous or dangerous activity are DISMISSED, leaving only Plaintiffs' claims for gross negligence and for exemplary damages under § 408.001(b) against WGPS;

(4) WGPS' motion for partial summary judgment (# 146) is GRANTED, and its motion to bifurcate trial (#208) and motion in limine (#220) are MOOT;

(5) Peregrine's motion for summary judgment (#125) is GRANTED and its motion in limine (#218) is MOOT.

(6) Because Intervenors Trinidad O. Torres and Jususita M. Torres were terminated on January 13, 2011, Intervenors' motion to join in Plaintiffs Response (#149) is MOOT.

**SIGNED** at Houston, Texas, this  15th  day of  March , 2012.

_____

MELINDA HARMON
UNITED STATES DISTRICT JUDGE